BOWEN v. ILLINOIS CENT. R. CO.

(Circuit Court of Appeals, Eighth Circuit. March 13, 1905.)

No. 2,102.

1. RAILROADS—ACTION FOR WRONGFUL DEATH—TORT OF SERVANT.

Under section 746, Rev. Code Civ. Proc. S. D., giving to the widow of the deceased a right of action for damages against a railroad company for the killing of her husband, by reason of the neglect, carelessness, or unskillfulness of the corporation, its agents, servants, and employés, the cause of action must come strictly within the terms of the statute conferring the right, and cannot be extended to any other subject or embrace any other quality of liability.

[Ed. Note.—For cases in point, see vol. 15, Cent. Dig. Death, §§ 10, 11, 15.]

2. SAME—TORTS OF EMPLOYÉS—SCOPE OF EMPLOYMENT.

Such loss of life must result from the negligence, carelessness, or unskillfulness of such agent and servant while engaged in and about the work assigned him by the master. Therefore, where the act complained of is the killing of plaintiff's husband by defendant's station agent while deceased was signing a receipt book for a package, it cannot be assumed that such package pertained to railroad freight matter, when the evidence showed that the wrongdoer was not only at the time and place acting as agent for an express company, as well as the railroad company, without some evidence warranting the inference that the package pertained to railroad freight, rather than express matter.

[Ed. Note.—For cases in point, see vol. 15, Cent. Dig. Death, § 16.]

3. SAME.

There is a marked distinction between an act done by the servant during his employment and an act done within the scope of his employment. To bind the master for an injury done by the servant, the servant must at the time be acting for the master within the scope of the duty assigned him.

4. SAME.

The distinction between the liability of the master for the wrongful acts of the servant in the instance of the relation of carrier and passenger, or hotel keepers and proprietors of theaters and their guests, and that

of the proprietor of a mere business house or railroad station, as to persons coming on the premises to transact some matter connected with its general business, pointed out.

5. SAME—EVIDENCE.

The deceased, having called at the railroad station to inquire of the agent as to whether any demurrage would be charged on account of his failure to unload a car of coal that day, and, being assured in the negative, turned to walk out of the room, when the agent said to him, "There is a package here for you," and handed to him, through the ticket window, a small book to be signed. Just as deceased started to sign his name therein, the agent picked up a pistol, and without a word shot the party to death. *Held*, that the widow could not recover damages against the railroad company for such wanton act of killing.

(Syllabus by the Court.)

In Error to the Circuit Court of the United States for the District of South Dakota.

This is a writ of error to review the action of the Circuit Court in directing a verdict for the defendant. After statements, by way of inducement, the gravamen of the petition is: That one Henry A. Steagald was a man of dangerous and violent character, subject to sudden fits of anger, disregardful of the persons and lives of others, and was not a fit man to have charge of the station house and depot of a common carrier, all of which was well known to the defendant; that, in disregard of its duty to the public and to one Frank Bowen, the defendant did, with knowledge of all of said facts, and the disposition of said Steagald, retain him in its employ in the position of station agent at Ben Clare, in the state of South Dakota; that on the 27th day of February, 1903, the said Frank Bowen, in the pursuit of his business with the defendant railroad company, as a common carrier, entered said station house to transact business with the defendant as common carrier, through the said agent, Steagald, respecting a car of coal shipped to said Bowen over the defendant's road to Ben Clare; that said Steagald, then and there acting as such agent and in the course of his employment, while said Bowen was in the discharge of his lawful business with the defendant, did shoot and kill the said Bowen, to the damage of the plaintiff, who is the surviving widow of the deceased, in the sum of $20,000. The answer of the defendant admitted that said Steagald was at the time in question the station agent of the defendant at said Ben Clare, and that he was authorized to transact for defendant such business as is usually and properly transacted by railroad station agents situated similar to the one at Ben Clare, but specifically denied that the said Steagald was at said time or at any other time its general managing agent, or general agent, in any character whatsoever. With the exception of admitting that the defendant was a railroad corporation organized under the laws of the state of Illinois, and that said Bowen was shot and killed by said Steagald, it denied all the other material allegations of the petition.

The evidence in the case is exceedingly brief. Earl Bowen, the son of said Frank Bowen, aged 13 years, testified that he had known said Steagald, the depot agent for the defendant at Ben Clare, for about six months prior to the 27th day of November, 1903; that on that day, in company with his father, who had an elevator and coal yard at Ben Clare, he entered the waiting room of the depot at that place; that the waiting room is separated from the depot agent's office by a partition, in which there is a door and the ticket window; that Steagald was at the open ticket window when his father asked Steagald if he would charge demurrage on a car of coal on a day like that. Steagald answered that he did not think so. Thereupon the witness and his father started to leave the depot, when Steagald called to his father and said there was a package there for him, whereupon his father turned around to the ticket window; that Steagald handed out a book about a foot square, in which his father started to write his name, when Steagald reached to one side, quickly jerked up a revolver, and shot his father, and then, running through the door which leads into the waiting room, again shot him, and, as the witness jumped between the door and the stove, he was shot and in-

jured by Steagald. Steagald did not say anything, and went back into the office. His father died that day. On cross-examination he testified that Steagald did not tell his father what kind of a package he had there. He simply said there was a package. The plaintiff testified that, when informed by her son of the occurrence, she went immediately to the depot and found her husband dead; that Steagald and his wife were in the depot office at the ticket window; that he spoke to her, but she did not recollect what he said; that she had known Steagald since October, 1902; that Ben Clare is a small station, and Steagald was station agent for the defendant road; that Steagald did the operating business there, handled the freight business, and acted as express agent; that he received express packages and telegrams. This was all the testimony.

At the request of defendant's counsel the court instructed the jury to return a verdict for the defendant, which was accordingly done, and judgment was entered thereon for the defendant.

Joe Kirby, for plaintiff in error.

W. S. Kenyon (C. O. Bailey and J. M. Dickinson, on the brief), for defendant in error.

Before SANBORN, Circuit Judge, and PHILIPS and RINER, District Judges.

PHILIPS, District Judge, after stating the case as above, delivered the opinion of the court.

As the plaintiff at common law could not maintain any action against the defendant railroad company to recover damages for the killing of her husband by a person in the employ of the corporation, her right of action exists, if at all, by virtue of some statute of the state of South Dakota. The only statutory provisions touching this matter are sections 745 and 746 of the Revised Code of Civil Procedure of South Dakota, which are as follows:

"Sec. 745. If the life of any person, not in the employment of a railroad corporation, shall be lost, in this state, by reason of the negligence or carelessness of the proprietor or proprietors of any railroad, or by the unfitness, or negligence, or carelessness of their employés or agents, the personal representatives of the person whose life is so lost, may institute suit and recover damages in the same manner that the person might have done for any injury where death did not ensue.

"Sec. 746. If the life of any person or persons is lost or destroyed by the neglect, carelessness, or unskillfulness of another person or persons, company or companies, corporation or corporations, their or his agents, servants, or employés, then the widow, heir, or personal representatives of the deceased, shall have the right to sue such person or persons, company or companies, corporation or corporations, and recover damages for the loss or destruction of the life aforesaid."

As the liability thus created is the creature of the statute, an action predicated thereon must come within its terms. The statute cannot be extended to any other subject, or embrace any other quality of actionable liability. The loss of life must be "by the neglect, carelessness, or unskillfulness of the corporation or corporations, their agents, servants, or employés." To show the liability on the part of the defendant company the petition charges that said Steagald was a dangerous, unfit, and incompetent person to be placed in the position he was by the defendant railroad company; that this fact was known to the company at the time of his employment; and that with this knowledge it continued him in its service. There is in this record not a word of evi-

dence to support this allegation, unless it can be maintained, as a matter of law, that a single act of willful homicide by the agent, committed after his employment, is proof, not only of general unfitness of the servant, but of the antecedent knowledge of the employer. It is so well settled as not to justify the citation of authorities that the presumption of law exists that the master has exercised due care and circumspection in the selection of a competent servant, and the burden rests upon him who asserts the negligence to affirmatively prove, not only the fact of incompetency, but the want of due care by the master in making the selection. Neither can the fact of such incompetency be established by proof of a single act of carelessness or recklessness after the contract of employment.

The plaintiff's evidence shows that Steagald had for six months prior to the killing of Bowen held the position of station agent at Ben Clare. There is no evidence that prior to this homicide even a delict had been imputed to this servant. In view of the facts disclosed by the plaintiff's evidence, which presumably were in the mind of her counsel when he framed the petition, it is manifest that his first conception of the law was that no responsibility attached to the railroad company for this wanton, reckless act of Steagald, unless it could be made to depend upon the negligence of the company, either in selecting such an agent, or in retaining him after having notice of his vicious character. The injury having been inflicted by the agent, the liability of the corporation can only arise by reason of the agent's neglect or carelessness in and about the conduct of the business to which he was assigned by the company. By the very terms of the statute the wanton act or conduct of the agent, which does not include neglect or carelessness in the prosecution of the agency, imposed no accountability on the master therefor, for the palpable reason that the statute giving the right of action in effect excludes it.

On the facts developed by the evidence it requires some restraint to discuss with patience the contention that in killing Bowen Steagald did the act negligently or carelessly in performing the work assigned him by the master. At the utmost the only inference possible is that Steagald was in the employ of the railroad company as its station agent at Ben Clare; that within the compass of his agency was the selling of tickets to passengers and receiving and delivering railroad freight. Bowen was not at the station as a passenger to buy a ticket. He was not there to deliver or receive freight. He went there solely for the purpose of making inquiry as to whether any demurrage would be exacted for the failure to unload a car of coal that day. When he was answered that in the opinion of the agent there would not be such demurrage, and he turned away, that matter was concluded. The assault committed had no legal relation thereto. When he was recalled by the statement that there was a package for him, and he was shot by Steagald while in the act of signing the receipt book therefor, in order to make out a case against the railroad company, it devolved upon the plaintiff to prove that such package pertained to the business of the railroad company. The plaintiff's evidence showed that Steagald not only had charge of freight matters at that station, but also of matters pertaining to the express company. The evidence did not show that the

package pertained to the business of the railroad company. If the package referred to was express matter, it did not pertain to the railroad as such, and therefore Steagald did not appear to be acting for the railroad company at the time. Whether the package came as railroad freight or as express matter was left entirely to the conjecture of the jury, to guess off. If this important fact was to be submitted to the chances of guessing right, there was not only as much, but better, reason for guessing that it was express matter. Signing a book at or near the window of the office would rather indicate that it was a receipt book for an express than a freight package. No package was displayed, and we do not know, save by the imputed statement of Steagald, that any package in fact was there to be delivered. As Steagald stood at the window of the ticket office, the indication was, when the book was signed, the package would be handed out through the window, not a place for the delivery of such bulky packages as would usually come by freight. Facts affirmatively established by tangible proofs, not conjectures, are essential to a right of recovery. Evidence that leaves the jury to roam at will in the field of conjecture and speculation to find a verdict can no more be tolerated by courts of justice than a judgment without any evidence. Central Coal & Coke Company v. Hartman, 111 Fed. 98, 100, 49 C. C. A. 244. On this ground alone the action of the Circuit Court in directing a verdict for the defendant might well be sustained. But, assuming that it was an actual freight package, a verdict for the plaintiff ought not to be upheld on the proofs.

The broad postulate laid down by counsel for plaintiff in error is that the railroad company owes the duty to every person who comes upon its premises to transact any business pertaining to railroad operations to protect him against personal assaults by its agents or servants at the time in charge of such premises. If this is to be established as incident to the relation between such master and servant, it will be far-reaching in its application, and would extend the doctrine of respondeat superior beyond any authoritative precedent. "Beware of analogies!" is a wholesome warning in applying the law of one class of subjects indifferently to another. Many decisions and utterances of courts, in cases growing out of the relation between carrier and passenger, are cited to support this action. The distinction between such cases and this is broad and obvious. The relation between carrier and passenger in the first place is contractual. From the moment the passenger comes to purchase his ticket and enters the train to the end of his journey he passes measurably under the control and direction of the agents and servants of the carrier, upon whom the law imposes the correlative duty of protecting him against insults, assaults, and injuries perpetrated by them, or others on the train, in so far as they can reasonably do so. As said by this court in Clancy v. Barker, 131 Fed. 161, 165, 166.

"The carrier takes and the passenger surrenders to him the control and dominion of his person, and the chief, nay, practically the only, occupation of both parties is the performance of the contract of carriage. * * * The carrier regulates the movements of the passenger, assigns him his seat or berth,. and determines when, how, and where he shall ride, eat, and sleep; while the passenger submits to the rules, regulations, and directions of the

carrier, and is transported in the manner the latter directs. The logical and necessary result of this relation of the parties is that every servant of the carrier who is employed in assisting to transport the passenger safely * * * is constantly acting within the scope and the course of his employment while he is upon the train, * * * because he is one of those selected by his master and placed in charge of the person of the passenger to safely transport him to his destination. Any negligent or willful act of such a servant, which inflicts injury upon the passenger, is necessarily a breach of the master's contract of safe carriage, and for it the latter must respond."

Conformably to this ruling it was said, in New Jersey Steamboat Co. v. Brockett, 121 U. S. 638, 7 Sup. Ct. 1039, 30 L. Ed. 1049:

"A common carrier undertakes absolutely to protect its passengers against the misconduct or negligence of its own servants, employed in executing the contract of transportation, and acting within the general scope of their employment."

It should, however, logically follow, from the premise on which this ruling is imposed, that, where the exceptional conditions on which it is propounded do not exist, the rule should not apply. In the case of the station agent, employed by the railroad company to receive and deliver freights, he is not expressly or impliedly commissioned by his employer to exercise any direction or control over the movements of the person shipping or receiving freight. It is the duty of the carrier of freight to furnish a reasonably safe place and means for receiving from and delivering to the customer his consignment. It is likewise a duty the company owes to such customer to furnish reasonably careful and competent servants to transact such business, and to see that they exercise due care in handling and delivering freight to the customer, so as not to injure him. For any neglect on its part in these respects, or inattention on the part of the servant while thus engaged in the course of the business committed to him, whereby the customer sustains injury and damage, the company is liable.

Confusion now and then appears in applying the law of responsibility of the master for the wrongs of the servant in not keeping in mind the distinction between the act done by the servant within the scope of, rather than during, his employment. Wood, in his work on the Law of Master and Servant, directs attention to this distinction in section 286:

"If the act of the servant is not expressly ordered by the master, or within the scope of his employment, the master is not liable therefor, even though done in the course of his employment. The question is whether the act was expressly or impliedly authorized by the master, and this is a question to be determined by the jury, in view of the employment, its character, the nature of the services required, the instructions given by the master, and the circumstances under which the act was done. * * * A master is liable for the act of his servant, done in the course of his employment about the master's business. But he is not responsible for an act done outside of his employment, nor for the wanton violation of the law by him."

In section 307 he says:

"The simple test is whether they were acts within the scope of his employment—not whether they were done while prosecuting the master's business, but whether they were done by the servant in furtherance thereof, and were such as may fairly be said to have been authorized by him."

So it is said, in Elliott's Law of Railroads, vol. 3, p. 1009:

"The general rule is that the master is liable for the willful acts of the servants with reference to the master's orders, or within the scope of their employment or the line of their duty, but not otherwise."

If the act done by the servant is within the scope of his employment, it is immaterial that it is wantonly done. The master is responsible for the manner in which it is done. This is illustrated by the following adjudged cases:

In Texas & Pacific Ry. Co. v. Hayden (Tex. Civ. App.) 26 S. W. 331, a boy boarded a freight train and paid his fare to the brakeman. Before reaching his destination he was ordered off by the brakeman. On his refusal the brakeman knocked him off with a piece of coal. It was held that, if the brakeman had authority to eject the boy, the company would be liable, because he was guilty of excessive means in accomplishing the service while acting in the scope of his employment.

This was true in Pierce v. N. C. R. R. Co. (N. C.) 32 S. E. 399, 44 L. R. A. 316. The brakeman had the right to eject parties from the train, and the railroad company was held responsible for an injury to the party in ejecting him in a reckless and wanton manner, on the ground that he was acting within the general scope of his employment.

In Denver & R. G. R. Co. v. Harris, 122 U. S. 597, 7 Sup. Ct. 1286, 30 L. Ed. 1146, the defendant railroad company was in a controversy with the Santa Fé Railway Company as to the possession of a piece of railroad. The defendant company sent an armed force of several hundred men in its employ, under its vice president or assistant general manager, to drive off the employés of the Santa Fé Railway Company, which was in peaceful possession of the track. The attacking employés were armed with deadly weapons, and in the execution of this demonstration of force and arms some of the employés of the defendant company fired upon the employés of the Santa Fé Company, injuring the plaintiff, Harris. The railroad company was held responsible for this tortious act, on the ground that the servants were acting within the scope of their employment.

In Haehl v. Wabash R. R. Co., 119 Mo. 325, 24 S. W. 737, a servant of the railroad company was employed to keep trespassers off of one of its bridges, and while performing this service he wrongfully shot and killed a trespasser. The company was held liable, on the ground that the act was done by the servant in the scope of his employment. The court states the rule as follows:

"The principal is responsible, not because the servant has acted in his name or under color of his employment, but because the servant was actually engaged in and about his business and carrying out his purposes. * * * But if his business is done, or is taking care of itself, and his servant not being engaged in it, but impelled by motives that are wholly personal to himself, and simply to gratify his own feeling of resentment, whether provoked or unprovoked, commits an assault upon another, when that has and can have no tendency to promote any purpose in which the principal is interested, and to promote which the servant was employed, then the wrong is the purely personal wrong of the servant, for which he, and he alone, is responsible."

Without multiplying authorities, it is sufficient to say that in these and their congeners the controlling principle, which binds the master to respond, is that, although the injury done by the servant was willful, or wanton, or done in an excessive manner, beyond the instructions or outside of the intendment of the master, nevertheless, being done within the scope of the employment, to which the master has assigned the servant, the master is responsible.

Illustrations of the nonliability of the master, under this rule, are furnished in the following cases:

Candiff et al. v. L., N. O. & T. Ry. Co., 42 La. Ann. 477, 480, 7 South. 601. The defendant's conductor, on discovering that a car had been broken open, believing that it had been done by a certain person, walked up to such person as he was quietly standing at the station and without a word shot him. It was held that, as this wanton act was entirely beyond the scope of any employment or function of the conductor, the company could not be held responsible. The court said:

"No stretch of the doctrine that masters are responsible even for the torts of their servants, when done within the scope of their employment and in the exercise of the functions in which they are employed, can make it cover such an act as this. Admitting that the conductor is charged with the duty of protecting the cars and contents confided to his care, and that acts done in execution of such charge are within the scope of his employment, and admitting that he supposed Candiff had broken into the car, and shot him for that reason, in what manner was such shooting, under such circumstances, necessary or conducive to the protection of the property?"

In C., R. I. & P. Ry. Co. v. Smith (Kan. App.) 63 Pac. 294, a section foreman was in the habit of carrying a gun upon handcars, without the knowledge or direction of the employer, used for his own purposes, and through the recklessness of the section foreman the gun was discharged, injuring his assistant. It was held that no recovery could be had against the railway company, on the ground that the employer is not liable for the acts of his employé, if such acts are not authorized by the former or done by the latter in the discharge of some duty.

In Turley v. Boston & M. R. R. Co. et al. (N. H.) 47 Atl. 261, the plaintiff testified that he went to the defendant's freight yards to look for coal cars, intending to apply for a job of shoveling coal, and was shot by defendant's servant while running away, after the latter had attempted to seize him as a trespasser. The court said:

"As there was no evidence tending to show that the shooting of the plaintiff by Saxton resulted from any fault of the defendants, was directed by them or done by their authority, or was any part of Saxton's work of cleaning and caring for the lamps in the yard, for which he was employed, * * * it cannot be found that the act of Saxton complained of, whether willful or negligent, was the defendants' act, or within the scope of Saxton's employment by them."

In Farber v. Mo. Pac. Ry. Co., 116 Mo. 81, 22 S. W. 631, 20 L. R. A. 350, a brakeman forced from a freight train in a rude manner a trespasser who was stealing a ride. The court held that the liability of the railroad company must rest on the law of agency, and not on that of common carrier, as the person was not a passenger;

and, as there was not sufficient evidence to show that the brakeman on the freight train was authorized to eject passengers, there was no liability on the part of the railroad company. The court said:

"The liability of the master for the acts of the servant rests now upon the condition whether or not the act of the servant was in the course of his employment."

The most extreme case sought by counsel for plaintiff in error to have this court follow is that of Daniel v. Petersburg R. R. Co. (N. C.) 23 S. E. 327. A passenger on the defendant railroad had accomplished his journey, departed from the train, and gone about his private business. He did not apply for his baggage for a day or so afterwards. When he did apply there were charges for its storage, the justness of which charge was not controverted by any evidence. He demurred to the charge, and got into an altercation of words with and applied to this agent of the railroad abusive epithets. After paying the charges and receiving his baggage, he turned to leave the room, and when he reached the door, said employé, smarting under the abusive epithets applied to him, shot and killed the man. His legal representative sued the railroad company for damages and was permitted to recover. The majority of the court, while placing stress on the proposition that the business of the deceased with the baggageman had its origin in the contract for carriage with the railroad company, placed the liability of the railroad company upon the ultimate proposition that at the time and under the circumstances the law laid upon' the railroad company the duty of absolute protection against such wanton violence of the servant, while the deceased was in the office for the purpose of transacting such matter of business. The minority opinion filed held that the placing of the responsibility of the master on the ground that the place of the assault was such as to invoke the rule of protection against a willful and wanton assault of the servant, as in the case of hotel keepers, proprietors of theaters and steamboats, and the like, was hardly sustainable, and preferred to establish the liability of the railroad company by stretching the relation of carrier and passenger to include the incident at the baggage room. This feat was accomplished by the "argumentum ad judicium." The position has no support in any well-considered case. It stands upon no fundamental postulate upon which the doctrine of respondeat superior has been builded. "If a case in law have no cousin or brother, it is a sure sign it is illegitimate." Bacon. When the intestate reached his destination, left the train and the premises of the company, going about his other affairs, the contract of carriage had been performed, and the relation of carrier and passenger was at an end. It is true that the contract of carriage included the baggage. While in transit, and in the storage room after it reached its destination, until a reasonable time had elapsed for its removal by the passenger, the duty of the carrier as to it was the exercise of a high degree of care for its safe carriage and prompt delivery. If the passenger would continue in force the greater responsibility of the carrier toward him and his baggage, he must apply at the place of delivery for his baggage on his arrival within a reasonable

time thereafter. Hutchison on Carriers, §§ 708–710. The passenger had not called for his baggage within a reasonable time, as storage charges had attached, and the carrier then held it as a warehouseman, a bailee for hire; and its obligation for it was only that of ordinary care, with the implied obligation on the part of the bailor to pay the reasonable storage charges. Hutchison on Carriers, § 712. While this obligation of the carrier as warehouseman, and the right of the intestate to call for and get his baggage, may technically be said to have had its root in the contract of carriage, yet, as the reason of the rule respecting the extraordinary duties of the carrier toward the passenger while under the jurisdiction and care of the carrier did not exist at the time of the injury, the rule itself ceased to apply. So that the liability of the railroad company for the unanticipated and improbable occurrence, provoked by the misconduct of the deceased and unlawfully resented by the servant, as the majority opinion rightly conceived, could be sustained only on the ground that it was the neglect of a duty on the part of the railroad company in not safeguarding every person who entered its place of business against violence and injury from its employés, no matter whether or not the injury had any legal connection with the manner of performing the duty assigned by the master to the servant.

This extreme rule of the master's liability as to place has hitherto been supposed to apply to carriers, as to their passengers, and to hotels, theaters, steamboats, or like places, as to their guests. It was applied by the Supreme Court of Pennsylvania, in Rommel v. Schambacher, 120 Pa. 579, 11 Atl. 779, 6 Am. St. Rep. 732. In that case the plaintiff, a minor, entered the tavern of the defendant, where he found one Flanagan, a guest. They became intoxicated on liquor furnished by the proprietor. While the plaintiff was standing on the outside of the bar engaged in conversation with the defendant, the third party pinned a piece of paper to the plaintiff's back and set it on fire, whereby he was badly injured. The proprietor was held liable for the injury, upon the ground that he was cognizant of the prank being played upon his guest, or that, having been guilty of making the third party drunk, or that he came there drunk and he knew that fact, he was bound to see that he did no injury to his customer.

The same rule was applied by the Supreme Court of Minnesota, in Curran v. Olson, 88 Minn. 307, 92 N. W. 1124, 60 L. R. A. 733, 97 Am. St. Rep. 517, to the instance of a saloon keeper, who gave to his house the quality of an inn, and suffered his guest to be badly burned by vicious persons saturating his feet with alcohol, while he was asleep, setting it on fire. Even there the liability of the proprietor, who was not present at the instant, was sustained upon the ground that he had knowledge of the prank being played upon his customer and took no steps to prevent it.

The liability of a hotel keeper in respect to injuries to his guests underwent thorough discussion by this court in the recent case of Clancy v. Barker, 131 Fed. 161. In that case a small boy, about six years of age, was a guest in the defendant's hotel, and wandered

out of his room into another room, where a bell boy, or a porter, of the hotel was playing a harmonica, for his own amusement, and the latter, accidentally or willfully, shot the boy with a pistol. The conclusion reached was—

"That when the defendants made their contract to entertain at their hotel the law was, and in our opinion it still is, * * * that their agreement was to exercise reasonable care for his safety, comfort, and entertainment, and that their agreement did not include an insurance of his person against the willful or negligent acts of their servants beyond the course of their employment."

Suppose that A. goes to a mercantile house and makes inquiry about some matter connected with its business, and when that is ended the clerk says to him, "There is a package here for you; please sign a receipt for it," and without more the clerk seizes a revolver and shoots the person to death. Is it possible that the owner of the house shall respond in damages for the injury, the result either of a fit of insanity or personal revenge on the part of the clerk, on the ground, not that it was done within the scope of his employment, but in a place where persons are invited to come and transact business with the house? How is it possible under such condition for any business house to conduct its affairs, dependent upon the employment of clerical assistance, if exposed to such liability, after the merchant has exercised due care in the selection of his clerk, who has worked for him for six months with no manifestations of insanity or homicidal tendency? How is he, within the bounds of reason, to safeguard himself against such abnormal outbreak wholly aside from any intendment connected with the work to which the clerk is assigned? To uphold the plaintiff's contention there would have to be written into the law of master and servant a new rule, making every employer an absolute insurer of the safety of every person who comes upon his premises to deal with him on any matter of his special business against any injury inflicted by any employé.

The judgment of the Circuit Court is affirmed.