G. M. NESBIT, Appellant, v. CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY, Appellee.

**Master and servant:** TORTS OF SERVANT: LIABILITY OF MASTER. A master is only liable for the torts of his servant when done in the prosecution of the master's business, and if the servant steps aside from the business of the master to accomplish some purpose of his own and commits an assault the master is not liable.

**Same:** LIABILITY FOR TORTS OF SERVANT: EVIDENCE. Where an affirmative duty rests upon the master to protect persons from injury, as passengers upon a train, or guests of an inn and the like, he is responsible for the wrongful, malicious or tortious acts of his servants, although not done in the course of their employment. In the instant case plaintiff with his son went to defendant's freight house for goods he was expecting and was assaulted by the foreman, the result, as claimed, of abusive language used by plaintiff and son while conferring concerning the delivery of the goods. *Held,* that the question of whether the foreman acted within the scope of his employment in assaulting plaintiff and removing him from the premises was for the jury, and the court erred in directing a verdict for defendant on the theory that the foreman's act was not within the scope of his employment, as a matter of law.

**Same:** ASSAULT: PROVOCATION. The use of abusive language does not justify an assault; and even though plaintiff may have attempted to strike the foreman in the instant case, that fact would not justify the use of more force than was reasonably necessary to protect himself and in pursuing plaintiff and forcibly ejecting him from the premises when retreating.

*Appeal from Blackhawk District Court.*—HON. FRANKLIN
C. PLATT, Judge.

MONDAY, NOVEMBER 17, 1913.

ACTION at law to recover damage for an assault made
upon plaintiff by one of defendant's employees. A jury was
called, and, at the conclusion of all the testimony, the trial
court sustained defendant's motion for a directed verdict,
and plaintiff appeals.—*Reversed.*

*Reed & Tuthill,* for appellant.

*F. W. Sargent* and *J. L. Parrish,* and *Mullan & Pickett,*
for appellee.

DEEMER, J.—Plaintiff is a physician, living at Waterloo,
Iowa. Anticipating a shipment of drugs over defendant's
road which he had ordered, he went to defendant's freight
house in an automobile, accompanied by his seventeen-year-old
son. One Pattison was defendant's freight house foreman,
who had full authority over the same, with the right to em-
ploy and discharge men in the conduct thereof. He had
charge of all incoming freight and of the freight house and
platforms used for loading and unloading goods. When
plaintiff and his son reached the freight house, plaintiff sent
the son into the freight depot to get the goods. When he
got into the depot, he picked out Pattison as the man in au-
thority, and asked him for the goods. Pattison told the boy
to go to the office, and get the expense bill. Acting upon this
suggestion, he went to the office, which was, as we under-
stand, on the second floor of the building, but found it locked.
He then returned to where his father was, thinking that he
might be able to get the goods. Upon the boy's return, the
two, father and son, went into the freight house, and plain-
tiff asked Pattison if he could get the drugs. Pattison then
asked the boy, "Did you get a bill?" to which the boy re-

sponded, "No; the office was closed." Pattison retorted, "Yes; the office closes at 3 o'clock." Plaintiff then said to Pattison, "Why didn't you tell the boy the office was closed?" to which Pattison responded, "I did tell the boy." Plaintiff then asked the boy if Pattison had so told him, and the boy said, "No; he didn't." We here quote from the boy's testimony as follows:

. . . Papa turned to Mr. Pattison, and says, 'The boy says you didn't tell him, and I don't believe you did;' and Mr. Pattison says, 'You call me a liar?' and Papa says, 'No; but you must be misrepresenting things around here;' and Mr. Pattison says, 'You call me a liar,' and Papa says, 'If any one is lying it must be you;' and then Mr. Pattison reached out and slapped him with the left hand, and Papa made an offer to grab him, and got hold of his arm, and I think maybe ripped his sleeve, and Papa turned around and started to run, and Pattison, right behind him, kept hitting him, and when he got to the end of the platform he gave him a shove, and, about as he was to shove him off, I went down to the other end, and he turned around after he got through shoving him off, and grabbed me, and hit me, and shoved me off, too. . . . Q. State how your father acted while Pattison was crowding him over toward the end of the platform. A. He was running toward the end of the platform getting out of the way.

A slightly different version of the matter was given by the boy on cross-examination, as follows:

Went up there to get a box of drugs. Saw men working in freight house. Asked him to get box of drugs. Directed me to Mr. Pattison, who was in box car. Asked him if I could get a box of drugs for Dr. Nesbit. He says, 'Have you got a bill?' I says, 'No.' He says, 'Go to the office and get a bill.' Went to office and found it locked. Went back, and told Father could not get bill or drugs because office locked, and we went together to Pattison. Father says, 'Can I get a box of drugs?' Mr. Pattison says, 'Did you get a bill?' I said, 'No; the office was closed.' He says, 'Yes; the office is closed at 3 o'clock.' Father says, 'Why didn't you tell the boy the office was closed?' Mr. Pattison says, 'I did tell the boy.' Papa turned to me and said, 'Did he tell you the office was

closed?' I said, 'No; he did not.' Father says, 'The boy said you did not tell him the office was closed; I do not believe you did, or he would not have gone up there.' Mr. Pattison says, 'Do you call me a liar?' Father says, 'No; I don't call you a liar, but I think you are misrepresenting things around here.' Mr. Pattison says, 'Well, you are a liar.' Father says, 'If anybody is lying around here, it must be you.' Pattison slapped him with his left hand. Father went back two or three feet. Pattison remained where he was standing. Father had both arms out in front of him, and tried to get his two arms. Did not strike him. Tried to catch hold of him. Q. He started towards Pattison, didn't he, and tried to strike him? A. No, sir. Q. You say he didn't try to strike him? A. No, sir; he had his two arms out, and looked like he was trying to grab him. Q. He rushed right up to Pattison, didn't he? A. Yes, sir. Q. And tried to strike him? A. If he had hold of him with both hands, he couldn't strike him. Q. What do you say as to whether he tried to strike him or not? A. He grabbed him. Q. Did you testify on the trial of the case of City of Waterloo v. Pattison that your father struck at Pattison, and didn't you answer, 'Yes, sir?' A. Yes, sir. Q. Didn't you further testify as follows: 'Didn't he have to step forward in order to do that?' and you answered, 'About one or two steps?' A. Yes, sir. Q. Question: 'He had to take one or two steps forward in order to strike Pattison? and did you not answer, 'Yes sir?' A. I don't remember that. Q. Question: 'Did he rush at him?' Answer: 'No; he took about two steps.' Question: 'How did he strike, with one hand or with both?' Answer: 'Two hands.' Did you testify to that? A. Yes, sir. Q. Question: 'Where did he strike Pattison?' Answer: 'I think along the arms.' Was that your testimony? A. Yes, sir. Q. Well, was it true, when you testified to it before upon the witness stand, that your father did attempt to strike Pattison? A. Yes, sir. Q. It was true, was it, when you testified to it then? A. Yes, sir. Q. And it is true now that he attempted to strike him, isn't it? A. Yes, sir.

Plaintiff's own version of the matter may be understood from this quotation from the record:

Q. What did you say to Mr. Pattison? A. I asked him if I could get the drugs, and Mr. Pattison turned to Harold, at my side, and said 'Did you receive the expense bill?' Harold said, 'No; I was there, and the office was closed, and I could

not get any bill.' . . . I asked Mr. Pattison why he didn't tell him. 'Oh, yes,' he says, 'the office closes at 3 o'clock, and any one comes there after 3 o'clock'—and I asked Pattison why he didn't tell him the office was closed, and he said he did, and Harold was right there, and I says, 'Did he?' and he says, 'No; he sent me upstairs to get the bill, and he would get the drugs for me.' . . . Mr. Pattison called the kid a liar, and said he did tell him. I says, 'That is a nice way to treat a boy like that; I don't think you told him that; he has never been here before, and he doesn't know anything about the platform or office, and he wouldn't be likely to go upstairs and look around for the office when he has never been there.' Mr. Pattison called me a liar then, and I says, 'No; I am not a liar; if any one is lying about this matter you are.' Then he struck me on the side of the face, turned me clear around, and knocked my hat off. I stood there with my automobile coat and one or two small medicine cases in my hand, or pocket, and didn't go up there with an expectation of what I received; had no idea of any trouble of any kind. . . . After he struck me, why, of course, I went to catch him with my hands. . . . I caught hold of his sleeve; his sleeves were rolled up here, and I got my finger in his sleeve, and I pulled his sleeve out. Then he struck me on the side of face with his hand, and knocked me down. I almost fell over flat towards him. I saw I was going to be very badly hurt, and I turned and ran toward end of platform, and all time I was running Mr. Pattison was pounding me on back, and when I come to end of platform he took me by shoulders and threw me down as hard as he could, and turned my ankle over, and I was bleeding from mouth and nose as hard as I could. I took my handkerchief, and it was filled with blood in no time. I realized my nose was broken, and I took it and straightened it up. I remained there little while, and Harold went and called police. . . . Where he threw me off the south end of platform there were no steps. They were on the west side. Just as he threw me off the platform, I turned around, and Harold followed me up, and just as I looked up I saw him take the boy, and slap him on the side of the face; I could hear it crack. Then he took him by the shoulders and set him off on the ground. After he struck me first I never turned back; went right off, and he kept following me, and put me off; never turned around at all.

On cross-examination, he testified:

Q. Now, when you found him, you demanded to know why you couldn't get that box of drugs, didn't you? A. Yes, sir. Q. And he said to you that you would have to have an expense bill, didn't he? A. No, sir; he didn't. Q. Didn't he ask the boy at that time if he had the expense bill? A. Yes. Q. And the boy told him he didn't have it? A. Yes, sir. Q. He said he couldn't deliver the goods unless he had the expense bill? A. He said, 'Oh, yes; the office is closed Saturday afternoon at 3 o'clock, and you can't get any expense bill this time of day.' Q. Then when he said that you said, 'Why didn't you tell the boy the office was closed, and not keep me waiting here?' A. Yes, sir. Q. You were a witness, Doctor, upon the criminal prosecution of Mr. Pattison that was tried in this court before a jury? A. I was. Q. You testified at that time in behalf of the state, didn't you? A. I believe I did. Q. Well, you know you did, don't you? A. Yes, sir. Q. And you told the transaction at that time as you understood it? A. I did. Q. Now, I will ask you whether you did not use this language at that time: 'I turned to Harold and asked him if he told him the office was closed and he couldn't get the drugs,' he said, 'No; he never told me any such thing.' And I said, 'I don't think you told the boy, or he wouldn't stood around here and kept me waiting.' A. Yes, sir. Q. You think you said that? A. I may have said that; yes, sir. Q. And you knew you couldn't get it without an expense bill? A. No, sir; I didn't. Q. Well, the boy told you, and you have so testified, that you couldn't get them without an expense bill. A. Yes, sir. Q. And you didn't have any, did you? A. No, sir.

Another witness named Murphy testified:

. . . Dr. Nesbit was coming toward the south end. He had his head down, and Pattison was cuffing him on both sides. Whether he had his fists shut or not, I cannot say. At end of platform he pushed him off, and then Dr. Nesbit's boy came up and faced Pattison with his hands up, whether to strike him or not, I don't know, and he took hold of him and shoved him off. When Pattison was pushing Nesbit, the boy was back of the platform about midway between. Seemed to stand there and take no part in matter. Pattison went two car lengths while he was striking Dr. Nesbit. During this time, doctor had his head down, and was going toward the end of

the platform. Once in a while he put his hand upon the car, and made no effort to strike Pattison. At end of platform he put up his hands. Whether he struck at him or not, I can't say. ¬Seemed to be guarding as near as I could tell. . . .

And still another testified:

. . . I was going to second platform with buggy. Mr. Murphy was with me. I was ahead, going up the platform. I had hold of the buggy handles. Mr. Murphy was pushing buggy. He spoke to me, and says, 'There is a fight,' and just as I looked around the buggy, why, Pattison pushed Nesbit off the platform, and turned around and said, 'Get off.' He put the doctor off of the end next to Naumans, the south end. Q. Did you hear the doctor say anything to Pattison during that time? A. No, sir. Q. Hear him swear at him? A. No, sir. Q. Did you hear the boy swear at anybody? A. No, sir.

This is the substance of plaintiff's evidence on the main issue in the case.

Pattison himself testified in part, as follows: ·

Q. What did he [the boy] say about the expense bill, if anything? A. Why, he did not say anything, and I repeated, I says, 'Have you a bill?' and he says, 'No.' Told him if he would go upstairs there might be some one left up there that would give it to him, and at that, I think, he went out. In five or eight minutes, something like that, he came up, accompanied by his father. I was in the car taking out last gate. I walked out. He said, 'How about that box of drugs?' I said, 'I will accommodate you if you have got an expense bill.' He said, 'Why didn't you tell the boy that?' I says, 'I did;' and the boy says, 'You are a liar; you didn't.' I says, 'What, you call me a liar?' and the father says, 'Yes; you are a liar; I would rather believe the boy than you.' And I slapped him. This occurred not five or eight feet from the door I came out of. Doctor was right in front of me, and boy was at my right side, back a little toward car on second track. . . . The platform where doctor and I were was under my personal control and supervision. When doctor and I had exchanged one or two pleasantries, I slapped him with my left hand on the right cheek. I hit him with my fist in the eye, right side of the nose, when he rushed at me. Think the slap was strong enough to make his head go back. Did it because I was angry

at being called a liar. I have been instructed time and again
on account of pilfering if anyone stepped on either of those
platforms I should immediately ask the reason why they were
there. Did not think doctor was there to do some pilfering.
Q. Where were Dr. Nesbit's hands when he first came up to
you? A. Why, just natural, I think, at his side. Q. That is,
when he came up to you there, as you stood by the car, and
first spoke to you? A. Yes, sir. Q. And where were his hands
when you were talking to him about this box? A. Right at
his side; I think it was. I paid no attention to it. I think his
hands were at his side during the time we conversed about the
box. Was forty feet from south end of platform when I
slapped him the first time, and thirty from south end when I
struck him with my fist.

Another witness testified for defendant:

. . . Pattison struck him; then doctor kind of wheeled
around like he was going away, staggered like. Pattison says,
'You will have to get off of here now.' He shoved him on a
ways, and started to come back, and he comes toward him that
way again, and he turned around again; then the boy come
and hit Pattison a blow right on jaw, so the old gentleman
he walks over to platform and walks off and he comes back and
says to the boy, 'Now, you will have to get off;' and he [Patti-
son] goes over to end and lifts him, and puts him down on
ground. . . .

And still another:

. . . Pattison said, 'What, you call me a liar?' Nesbit
said, 'Yes; you are a liar; I would rather believe the boy than
you.' Pattison slapped him on the side of face with left
hand. Nesbit made lunge for him, and kind of grabbed for
him on his left arm. Pattison struck him with his left hand in
his face. Doctor kind of moved back, but turned around like;
then Pattison took hold of him and told him to go on, and get
off of there. Grabbed him by shoulders and gave him a lit-
tle punch, and said, 'Now, get off of here.' Pushed him seven
or eight feet. Just gave him a little start was all. Were
twenty-five or thirty feet from end of platform when Pattison
took hold of Nesbit the second time, and told him to get off the
second time. Nesbit kept right on going until he got to end of
platform and jumped off. . . .

This is a sufficient statement of the record to present the

matter of law involved on this appeal.    The verdict was directed because the assault of Pattison was considered not within the scope of his authority; and that the defendant was in no way responsible therefor, and this presents the only question for review.

The rule as to the liability of a master for the torts of his servant is well understood and easy of statement; but its application to given facts has been one of extreme difficulty, with the result that there are a large number of apparently conflicting cases.

1. MASTER AND
SERVANT: torts
of servant:
liability of
master.

As announced in *Everingham v. Railway,* 148 Iowa, 662, the rule is as follows:

. . . It is fundamental that a master is not liable for all assaults made by his servant.    It is only for such as are done in the prosecution of the master's business that the master is liable.    If the servant steps aside from his master's business, and, in order to effect some purpose of his own, commits an assault, the master is not liable.    This is clearly pointed out in the following cases already decided by this court: *Alsever v. Railroad,* 115 Iowa, 338; *Dougherty v. Railroad,* 137 Iowa, 257; *Kincade v. Railroad,* 107 Iowa, 682; *Dolan v. Hubinger,* 109 Iowa, 408; *Porter v. Railroad,* 41 Iowa, 358; *Golden v. Newbrand,* 52 Iowa, 59; *Marion v. Railroad,* 59 Iowa, 428.    In the latter case it is said: 'The rule is that an employer is not liable for a willful injury done by an employee, though done while in the course of his employment, unless the employee's purpose was to serve his employer by the willful act.    Where the employee is not acting within the course of his employment, the employer is not liable even for the employee's negligence, and the mere purpose of the employee to serve his employer has no tendency to bring the act within the course of his employment.'    One of the best statements of the rule is found in Cooley on Torts (2d Ed.) 628, which reads as follows: 'So, if the conductor of a train of cars leaves his train to beat a personal enemy, or from mere wantonness to inflict an injury, the difference between his case and that in which the passenger is removed from the cars is obvious.    The one trespass is the individual trespass of the conductor, which he has stepped aside from his employment to commit.    The other is a trespass

committed in the course of the employment, in the execution of orders the master has given and apparently has the sanction of the master and contemplates the furtherance of his interests. . . . The test of the master's responsibility is not the motive of the servant, but whether that which he did was something his employment contemplated, and something which, if he should do it lawfully, he might do in the employer's name.' A master holds out his agent as competent and fit to be trusted, and thereby, in effect, warrants his fidelity and good conduct in all matters within the scope of his agency. Story on Bailments, sections 400, 406. But he does not and should not be held to warrant his servant's conduct in matters outside of the scope of that agency. In other words, he cannot be held to be an insurer in matters not relating to the conduct of the master's business.

Again, in *Seybold v. Eisle*, 154 Iowa, 128, we said:

The general rule, as stated in *Lewis v. Schultz*, 98 Iowa, 341, is as follows: 'If the servant was acting in the course of his employment in clearing up and leveling off the meadow, and while so doing committed the wrong complained of, the master is liable, although the servant may have disobeyed the master's instructions with reference to setting out fire. It is sufficient to make the master responsible if the wrongful act of the servant was committed in the business of the master, and within the scope of his employment, and this although the servant in doing it departed from the instructions of his master' (Mechem, Agency, sections 734)—or, as stated by Judge Cooley, in his work on Torts (2d Ed.) 63: 'It is, in general, sufficient to make the master responsible that he gave to the servant an authority, or made it his duty, to act in respect to the business in which he was engaged when the wrong was committed and that the act complained of was done in the course of his employment.' Again, in *Healy v. Johnson*, 127 Iowa, 226, we said: 'The doctrine of respondeat superior is not limited to the acts of the servant done with the express or implied authority of the master, but extends to all acts of the servant done in discharge of the business intrusted to him, even though done in violation of his instructions. See authorities collected in 20 Am. & Eng. Enc. of Law (2d Ed.) 167.' In *Morier v. St. Paul R. R.*, 31 Minn. 351 (17 N. W. 952, 47 Am. Rep. 793), the court of that state announced the rule as follows: 'Beyond the scope of his employment, the servant is as much a stranger

to his master as any third person. The master is only responsible so long as the servant can be said to be doing the act, in the doing of which he is guilty of negligence, in the course of his employment. A master is not responsible for any act or omission of his servant which is not connected with the business in which he serves him, and does not happen in the course of his employment, and, in determining whether a particular act is done in the course of the servant's employment, it is proper first to inquire whether the servant was at the time engaged in serving his master. If the act be done while the servant is at liberty from the service and pursuing his own ends exclusively, the master is not responsible. If the servant was, at the time when the injury was inflicted, acting for himself, and his own master pro tempore, the master is not liable. If the servant steps aside from his master's business, for however short a time, to do an act not connected with such business, the relation of master and servant is for the time suspended. Such, variously expressed, is the uniform doctrine laid down by all authorities.' . . . A learned text-writer, after a careful review of the authorities, thus stated the rule: 'It is not necessary, in order to fix the master's liability, that the servant should, at the time of the injury, have been acting under the master's orders or directions, or that the master should know that the servant was to do the particular act that produced the injury in question. It is enough if the act was within the scope of his employment, and, if so, the master is liable, even though the servant acted willfully and in direct violation of his orders. . . . A master cannot screen himself from liability for an injury committed by his servant within the line of his employment by setting up private instructions or orders given by him, and their violation by the servant. By putting the servant in his place he becomes responsible for all his acts within the line of his employment, even though they are willful and directly antagonistical to his orders. The simple test is whether they were acts within the scope of his employment— not whether they were done while prosecuting the master's business, but whether they were done by the servant in furtherance thereof, and were such as may fairly be said to have been authorized by him. By authorized is not meant authority expressly conferred, but whether the act was such as was incident to the performance of the duties intrusted to him by the master, even though in opposition to his express and positive orders.' Wood on Master and Servant (1st Ed.) 585. The

VOL. 163 IA.—4

same author said: 'Without stopping to give further illustrations from the modern cases, it may be said to be well settled that the master is not only responsible for the negligence or misfeasance or malfeasance of his servant in respect to the discharge of duties expressly imposed upon him, but also in all cases where the act of the servant is within the scope of his implied authority, and in determining this the nature of the employment, and the ends and purposes sought to be attained, are material elements and the real test of liability. Prima facie, when the act is one which the master himself might have done, it will be presumed that it was an act within the scope of the servant's authority, and the burden of proving want of authority rests upon the defendant.' Wood on Master and Servant, 559. . . . Whether the servant was at the time in question acting within the scope of his employment or outside of it to effect some purpose of his own is generally a question of fact for a jury, and its verdict is conclusive, provided there be any substantial testimony to support it. *Mott v. Ice Co.*, 73 N. Y. 543; *Cohen v. Dry Dock Co.*, 69 N. Y. 170; *Schulte v. Holliday* [54 Mich. 73, 19 N. W. 752], supra.

In addition to these rules, the modern doctrine is that, if the master owes an affirmative duty of protecting a party from injury, as a passenger upon a railway train, an occupant of a

2. SAME: liability for torts of servant: evidence.

sleeping car, a guest of an inn, or any other person to whom the master owes an affirmative duty of protection, he is responsible for the wrongful, malicious, or tortious acts of his servants, although not done in the course of their employment. *Garvick v. Railroad,* 124 Iowa, 691; S. C., 131 Iowa, 415; *St. Peter v. Telephone Co.*, 151 Iowa, 294; *McDonald v. Franchere*, 102 Iowa, 496; *Bryan v. Railroad,* 63 Iowa, 464; *Johnson v. Railroad,* 58 Iowa, 348; *Healy v. Johnson,* 127 Iowa, 221; *McKinley v. Railroad,* 44 Iowa, 314; *Swinarton v. Le Boutillier,* 7 Misc. Rep 639 (28 N. Y. Supp. 53, affirmed in 148 N. Y. 752, 43 N. E. 990); *Brooks v. Jennings,* 35 Ind. App. 221 (73 N. E. 951). Also cases cited in notes to *Daniel v. Railroad,* 4 L. R. A. (N. S.) 485; *Gassenheimer v. Railroad,* 40 L. R. A. (N. S.) 998; *Hayne v. Railroad,* 3 L. R. A. (N. S.) 605. Just how far this

doctrine should be extended has not as yet been thoroughly settled, but see *Porter v. Railroad,* 41 Iowa, 358; *Pullman's Car Co. v. Campbell,* 154 U. S. 513 (14 Sup. Ct. 1151, 38 L. Ed. 1069); *Mann Car Co. v. Dupre,* 54 Fed. 646 (4 C. C. A. 540, 21 L. R. A. 289); *Horgan v. Railroad,* 208 Mass. 287 (94 N. E. 386); *Gasway v. Railroad,* 58 Ga. 216; *Texas R. R. v. Jones* (Tex. Civ. App.) 39 S. W. 124; *Southwestern R. R. v. Franklin* (Tex. Civ. App.) 44 S. W. 701; *Georgia R. R. v. Richmond,* 98 Ga. 495 (25 S. E. 565); *Bowen v. Railroad,* 136 Fed. 306 (69 C. C. A. 444, 70 L. R. A. 915); *Texas v. Cassidy* (Tex. Civ. App.) 137 S. W. 389; *Williams v. Telephone Co.,* 12 Misc. Rep. 565 (33 N. Y. Supp. 849). *Contra: Berryman v. Railroad,* 228 Pa. 621 (77 Atl. 1011, 30 L. R. A. (N. S.) 1049); *Cobb v. Simon,* 119 Wis. 597 (97 N. W. 276, 100 Am. St. Rep. 909); *Hupfer v. Distilling Co.,* 114 Wis. 279 (90 N. W. 191). The rule of extended liability as to carriers has been applied to express companies *Richberger v. Express Co.,* 73 Miss. 161 (18 South. 992, 31 L. R. A. 390, 55 Am. St. Rep. 522), to theater managers *Dickson v. Waldron,* 135 Ind. 507 (34 N. E. 506, 35 N. E. 1, 24 L. R. A. 483, 488, 41 Am. St. Rep. 440). But see *Railroad v. Baum,* 26 Ind. 73; *Fowler v. Holmes* [City Ct.] 3 N. Y. Supp. 816, to hotel keepers *Curtis v. Dinneen,* 4 Dak. 245 (30 N. W. 148); *Wade v. Thayer,* 40 Cal. 578; *Gile v. Libbey,* 36 Barb. [N. Y.] 70. *Contra: Evansville v. Baum,* 26 Ind. 73; *Caly's Case,* 8 Coke, 32, to freight agents *Columbus v. Christian,* 97 Ga. 56 (25 S. E. 411). *Contra: Bowen v. Railroad,* 136 Fed. 306 (69 C. C. A. 444, 70 L. R. A. 915), to baggage masters, *Georgia R. R. v. Richmond,* 98 Ga. 495 (25 S. E. 565), to mercantile houses, *McDonald v. Franchere, supra; Collins v. Butler,* 83 App. Div. 12 (81 N. Y. Supp. 1074). *Contra: Bowen v. Railroad, supra; Mali v. Lord,* 39 N. Y. 381 (100 Am. Dec. 448), to agricultural associations, *Brooks v. Ass'n,* 35 Ind. App. 221 (73 N. E. 951), to bailors and bailees, *Jones v. Glass,* 35 N. C. 305, to street car drivers, *Wise v. Railway,* 91 Ky. 537 (16 S. W. 351), and to Pullman car employees, *Pullman Co. v. Lawrence,* 74 Miss. 782 (22

South. 53); *Airey v. Pullman Co.,* 50 La. Ann. 648 (23 South. 512); *Campbell v. Car Co.* [C. C.] 42 Fed. 484).

The reason for these exceptions or apparent exceptions to the rule of nonliability, where the act of the servant is not within the scope of his employment, actual or apparent, is that the master owed the person injured some special duty. *Birmingham v. Baird,* 130 Ala. 334 (30 South. 466, 54 L. R. A. 752, 89 Am. St. Rep. 43), and this exception has been applied in many cases where a patron of a carrier was assaulted by an employee thereof, *Columbus Co. v. Christian,* 97 Ga. 56 (25 S. E. 411); *Georgia Co. v. Richmond,* 98 Ga. 495 (25 S. E. 565); *Savannah v. Quo,* 103 Ga. 125 (29 S. E. 607, 40 L. R. A. 483, 68 Am. St. Rep. 85).

Apparently without reference to this exception, it has been held that an assault committed by an employee of a railway company upon a consignee of freight who was in the freight house for the purpose of getting his freight was within the scope of the employee's employment. *Gassheimer v. Railroad,* 57 South. 718 (40 L. R. A. (N. S.) 998); *Daniel v. Railroad,* 117 N. C. 592 (23 S. E. 327). See, also, to same effect, *Case v. Hulsebush,* 122 Ala. 212 (26 South. 155).

In *Gassheimer* case, it was said:

The court below makes it clear that the motion was overruled on the theory that the jury might have inferred that Mabson assaulted plaintiff because plaintiff had made complaint to his superior officers, and that an assault committed for such reason was not within the scope of Mabson's employment. In this the court erred. It is well settled in the decisions of this court that corporations are liable for the wrongful acts of their agents or employees, done in the course of their employment, or in the line of their assigned duties. The difficulty in particular cases arises in the proper application of this principle of law to the facts. The case of *Case v. Hulsebush,* 122 Ala. 212 (26 South. 155), is strikingly like the case at bar in all essential respects. In that case the tax collector of Mobile county was held personally liable for an assault and battery committed by his deputy upon a taxpayer who had gone to the collector's office to pay taxes. The assault grew

out of a dispute about a fee the deputy sought to collect. In the case at hand there is nothing to indicate, however remotely, that the assault grew out of anything but the delay in the delivery of plaintiff's freight. The trial court referred the assault, or held that the jury might have referred it, to the fact that plaintiff had complained to Mabson's superior officers. But the complaint was about the delay, and we have no difficulty in taking all that occurred between plaintiff and Mabson and Mabson's superiors as part and parcel of one transaction.

And, in *Daniel's* case, the court said:

A patron of the defendant, while in his warehouse on business connected with the road, is entitled, from defendant's agent, to protection against assaults or insults from any one. The language of the deceased to the agent was rude and wrong, for which the agent had a right to expel him from the premises by using such force as was necessary, and no more. The offensive language of the deceased, however, did not justify or excuse the violence of the agent, and, if his violent act was done within the scope of his employment or line of duty, then his employer, the defendant, is liable in damages for the injury complained of, by reason of the original contract, and the act of the agent while so engaged. Was the agent's act in the course of his employment, and while about the master's business? No decisive test can be given; but in all cases the question whether the act was committed by the servant in the service of his employer, or for his own purpose, is one for the jury, in view of all the circumstances. Wood, Mast. & S. 594; *Hussey v. Norfolk Southern R. Co.*, 98 N. C. 34 (3 S. E. 923, 2 Am. St. Rep. 312). In this case that question was submitted to the jury in the charge of the court, and by their verdict the fact that the agent was acting within the line of his employer's business is settled in the affirmative.

In *New Ellerslie Club v. Stewart*, 123 Ky. 8 (93 S. W. 598, 9 L. R. A. (N. S.) 475), the Supreme Court of Kentucky said:

It is further urged that, in committing the assault upon appellee, Proctor was not acting within the line of his employment, and therefore the fishing club is not liable for his conduct, and in support of this view our attention is called to the cases of *Louisville & N. R. Co. v. Routt*, 76 S. W. 513 (25 Ky. Law Rep. 887); *Sullivan v. Louisville & N. R. Co.*, 115 Ky.

447 (74 S. W. 171, 103 Am. St. Rep. 330). In the first men-
tioned case, the corporation was held not liable for the act of
its servant in purposely and maliciously throwing a lump of
coal at Routt, with a design to injure him; the servant not
being at the time acting within the scope of his employment.
In the latter case the court said: 'Where the servant steps
aside from his employment, and assumes to act and does act
solely on his own account in a matter which the master has no
more connection with than if he were the most complete stran-
ger, it would not be logical or fair to make the master vicari-
ously suffer for it, for, in doing that act, the servant, so called,
was absolutely his own master.' In both these cases the initial
act of the servants was outside the line of their employment.
At no time during the transaction were they acting within the
scope of their duties. It is difficult to define with accuracy the
point at which the master's liability for the acts of his servant
ends; but, under the facts of this case, Proctor, when he
attempted to prevent appellee from fishing, and when the alter-
cation between them commenced, was clearly acting within the
scope of his employment, and the assault and battery com-
plained of was merely a continuation of the first act. There
was no appreciable length of time between them. Everything
that was done happened on the premises under the control of
the fishing club, and where Proctor had authority as its agent.
Where the agent begins a quarrel while acting within the scope
of his agency, and immediately follows it up by a violent
assault, the master will be liable, as the law under the circum-
stances will not undertake to say when, in the course of the
assault, he ceased to act as agent and acted upon his own
responsibility.

In *Richberger v. American Express Co.*, 73 Miss. 161 (18
South 922, 31 L. R. A. 390, 55 Am. St. Rep. 440), the court
said:

But it is urged that, however, applicable this doctrine may
be to carriers of passengers, it is not applicable to employees
of an express company. Doubtless there is a difference in the
extent of the application of the principle, as between carriers
of passengers and express companies, measured exactly by the
difference in the things done by them in the discharge of their
duties, respectively. But the principle applies to both. An
express company does not transport passengers, and cannot be

made liable, as a carrier of passengers might, for willful tort
committed by its agent on passengers in their transportation;
but it keeps offices for the transaction of its proper business,
a business calling to its offices every day thousands of citizens,
and in its dealing with its customers in its offices, in its busi-
ness, it is bound, in Judge Story's language, 'for respectful
treatment and for decency of demeanor.' It is impossible to
say, on the allegations of this declaration, that the tort com-
mitted immediately upon the delivery of the receipt to the
agent, and because of the demand for the refunding of what
was plaintiff's conceded due, was so separated in time or logical
sequence as not to have been an act done in the master's busi-
ness. The whole transaction occurred in the shortest time, and
was one continuous and unbroken occurrence. The cursing
and abusing and maltreatment were all administered in con-
nection with the taking of the receipt, and immediately upon
its delivery, and because of the demand for his rights in that
matter, and while plaintiff was in appellee's office to transact,
and transacting, this very business. What was said and done
thus immediately upon the delivery of the receipt was part
of the res gestæ. As well said by Judge Thompson, in his Com-
mentaries on Corporations (section 6299, top of page 4928):
'In this view, even under the modern doctrine, the acts and
declarations of the servant or agent tending to show his state
of mind at the time of the act complained of would be admis-
sible in evidence as part of the res gestæ.' We have heretofore
quoted from the masterly opinion of Judge Andrews in
*Rounds v. Delaware, L. & W. R. Co.,* 64 N. Y. 136 (21 Am.
Rep. 597), in *Illinois C. R. Co. v. Latham,* 72 Miss. 32 (16
South. 757), to show when in this character of case the corpora-
tion would not be liable. Complementary to that, we close this
opinion with the words of the same great judge, in the same
case, at page 134 of 64 N. Y. (21 Am. Rep. 597), to show here
a case of liability: 'The master who puts the servant in a place
of trust or responsibility, or commits to him the management
of his business or care of his property, is justly held respon-
sible when the servant, through lack of judgment or discretion,
or from infirmity of temper, or under the influence of passion
aroused by the circumstances and the occasion, goes beyond the
strict line of his duty or authority, and inflicts an unjustifiable
injury upon another.'

Again in *Dunn v. W. U. Tel. Co.*, 2 Ga. App. 845 (59 S. E. 189), the Court of Appeals of Georgia said:

From this principle, universally recognized, springs the corollary that all such persons, natural and artificial, shall afford to such members of the public as have occasion to transact with them business of the nature they are holding themselves out as being accustomed to do safe and decent access to the places opened up for the transaction of the business in question. This safety does not mean mere physical safety, nor this decency mere absence of obscenity; but by the employment of the expression 'safe and decent access' it is intended to connote also the notion of freedom from abuse, humiliation, insult, and other unbecoming and disrespectful treatment. A member of the public is not to be deterred from transacting or offering to transact the business which the law compels a telegraph company to accept impartially from every person by reason of the fact that he cannot enter the public office without being subjected to insult or personal affront. A violation of this duty has occurred whenever a person entering the telegraph office for the purpose of sending a message has been met with disrespectful or insulting treatment at the hands of the company's agents. It is immaterial that the person thus injured had no personal interest in the message, or that he was the mere agent of another, for there is no such requirement as that persons desiring to transact business with public utility corporations shall do so in person. The fact that the right of respectful treatment, while attempting to do business with a public service company, follows as the natural sequence from the right to be served impartially and at all reasonable times seems to render the citation of authority as to the existence of this right of respectful treatment unnecessary. We do, however, call attention to the Georgia cases of *Gasway v. Atlanta & West Point R. Co.*, 58 Ga. 216, 221 and *Georgia R. Co. v. Richmond*, 98 Ga. 495, 502 (25 S. E. 565). It will be noted that, while these were actions against carriers, in neither case did the liability depend upon the fact that the plaintiff was a passenger. In *Gasway's* case he was attempting to check baggage as agent for his wife. In *Richmond's* case he had called at the passenger station to see about certain trunks, and the court, in deciding the case, took pains to call attention to the fact that the relation of carrier and passenger did not exist at that time. We might multiply citation of precedents; but these are sufficient.

Without quoting from other cases, it is enough to cite the following additional: *Rogahn v. Foundry*, 79 Wis. 573 (48 N. W. 669); *Morris Co. v. Henley*, 145 Ala. 678 (40 South. 52); *Anderson Co. v. Diaz*, 77 Ark. 606 (92 S. W. 861, 4 L. R. A. (N. S.) 649, 113 Am. St. Rep. 180); *Letts v. H. Steamship Co.*, 70 N. J. Law, 358 (57 Atl. 392); *Goodwin v. Greenwood*, 16 Okl. 489 (85 Pac. 1115); *Bergman v. Hendrickson*, 106 Wis. 434 (82 N. W. 304, 80 Am. St. Rep. 47).

Looking now to the facts which the testimony tended to establish, we find that defendant is a corporation, engaged in a public duty as a common carrier; that it put Pattison in charge of its freight office, where its patrons were invited to go. In virtue of his employment, Pattison had undoubted authority to remove trespassers and undesirables both from the freight house and the loading and unloading platforms. Plaintiff went to the freight house on an entirely legitimate errand, and upon an implied invitation to call there for goods which he was expecting to receive by freight. Down to the time when the assault was committed he was conferring with Pattison about an entirely legitimate matter. Although he used abusive and insulting language to Pattison, this did not justify Pattison in making an assault upon him. The matter of securing the goods was so closely related to the assault that it would not do to say, as a matter of law, that the assault was so entirely disconnected with the delivery of the goods that the defendant should not be held responsible therefor. The whole matter grew out of plaintiff's attempt to get his goods, and we should not say, as a matter of law, that the assault was so far removed from Pattison's duties in the premises that the defendant should not be held responsible therefor. In view of the public nature of defendant's employment, of the fact that plaintiff was entitled to go upon the premises to receive his goods, and that defendant owed him the duty of protection while there, the least that can be said is that the question of whether or not the act of Pattison's was within the scope of his employment in assaulting the plaintiff and removing him

from the freight house and platform was one of fact for a jury.

That plaintiff used abusive language toward Pattison would not justify an assault, and, even if plaintiff attempted to strike Pattison, this would not justify the latter in doing more than was reasonably necessary to protect himself from the assault. It would not justify the servant in pursuing plaintiff, striking him from the rear, and pushing or kicking him from the platform. Our conclusion is fully sustained in *St. Peter v. Telephone Co.*, *supra; Johnson v. Railroad,* 58 Iowa, 348; *Hamilton v. Railroad,* 119 Iowa, 650.

3 : SAME : assault : provocation

The trial court was in error in directing the verdict, and its judgment must be and it is *Reversed.*

WEAVER, C. J., and GAYNOR and WITHROW, JJ., concurring.