## UNION DEPOT & RAILROAD CO. V. SMITH.

1. POLICE OFFICERS — POWER OF CITY GOVERNMENT TO APPOINT SPECIAL.— The authority of a city government to appoint police officers, authorized to arrest individuals for the supposed violation of city ordinances, must be conferred by statute; and where such authority is conferred by the city charter solely upon the mayor, it can neither be restricted nor extended by ordinance. So where the charter provides that "the mayor may, upon any emergency or riot, pestilence or invasion, or at any time when he shall deem it necessary for the peace, good order and health of the city, appoint special policemen for a specified time, not exceeding two days, without the approval of the city council," such approval is essential to the continued duration of the appointment beyond the time limited.

2. FALSE IMPRISONMENT — ACTION FOR DAMAGES.— Where a special policeman for a railroad depot within the municipality is appointed for an indefinite time by the mayor thereof, the appointee to receive no pay from the city, he being employed and paid by the depot company, and acting generally, in his official capacity, under the orders and directions of the depot superintendent, his official authority ceases on the expiration of the charter limitation, unless the appointment be approved by the council. In the absence of proof of such ratification, the mayor's commission will not protect the depot company in an action for damages for false imprisonment brought against it by one arrested by the officer for a supposed violation of a city ordinance.

3. THE MAYOR'S COMMISSION NOT CONCLUSIVE.— The authority of the alleged officer being in issue, it was the province of the court to investigate the existence and extent of the power of appointment, and it appearing that the executive who issued the commission was not clothed with the power he assumed to exercise, the commission was not conclusive, either of the legality of the appointment or of its duration. In the absence of proof to show the municipal action necessary to the continuance of the officer's authority, he is to be regarded merely as the agent of his employer, and as acting in its behalf, and without official authority.

4. VERDICT FOR DAMAGES ALLEGED TO BE EXCESSIVE.— In case of an unwarranted interference with the personal liberty of a citizen, under circumstances indicating an oppressive use of a supposed authority, a court of last resort cannot say that a verdict for $3,000 damages, though unusually large, is excessive, it being the result of the third trial of the action to a jury.

*Appeal from the Superior Court of Denver.*

IN December, 1883, while assuming to exercise police authority within the depot grounds of the appellants in the city of Denver, one E. H. Rust arrested the plaintiff Smith and placed him in confinement. At this time Smith was in the employ of Marrs & Middleton, baggage and transfer men doing business in that city. Smith's duties required him to meet the incoming trains of the various roads entering the city and solicit from the passengers the transfer both of the people and their baggage to their various destinations in the city. Whatever work was done by Smith under those circumstances seems to have been done on the trains before their actual arrival at the depot. At this time there was an ordinance prohibiting persons from soliciting the carriage of passengers in hacks and busses unless the solicitor was possessed of a license issued by the city. There seems to have been a controversy between Marrs & Middleton, their employees, and the depot officers in regard to their rights in this particular. Apparently it had been the custom of the agents of the transfer company to show the passengers which they had solicited upon the trains to the various carriages and busses under their direction. This seems to have been assumed by the hackmen, who might be termed the contending parties, a violation of the ordinance concerning solicitation. A good deal of feeling had arisen in the matter between the transfer company and its employees and other persons engaged in the same business. The employees of the transfer company were on several occasions arrested for doing this same thing; but they were always discharged on the hearing. On the day in question Smith met the incoming train at Petersburg

and sold to Miss Warren, of Colorado Springs, a carriage ticket. When the train arrived in Denver, Miss Warren was accompanied by a gentleman who carried her baggage, and was escorted toward the place where the carriages were standing. It does not appear that Smith solicited Miss Warren to become his passenger within the depot grounds subsequent to the time of the sale of the ticket on the train. As the parties approached the outside of the depot Smith held up his finger and walked towards the carriage. The parties followed him to the conveyance, were shown in and driven off. Rust stood in the archway of the depot and saw the parties approach the carriage, and may possibly have seen Smith indicate its locality. The circumstances occasioned a good deal of disturbance among the hackmen, whereupon Rust interfered and took Smith into custody. The appellants contend that Rust was acting in the matter as a policeman, by virtue of a commission from John L. Routt, then mayor of Denver, which in form is as follows:

" *To all to whom these presents shall come, Greeting:*

" That having great confidence in the ability and integrity of E. H. Rust, I, John L. Routt, mayor of Denver, have and do by these presents constitute and appoint him, the said E. H. Rust, of the city of Denver, to the office of special police at the depot, without pay from the city. To have and to hold said office with its emoluments during

——.

" In witness whereof, etc.

" Done at Denver this 26th day of April, 1883.

"JOHN L. ROUTT, Mayor."

In 1883 the legislature issued a special charter for the city of Denver which provided for the creation of a police department and conferred upon the mayor authority to appoint the general police of the city with the concurrence of the common council, and authority to appoint special police under certain circumstances. This authority is found in section 8, article 5, and is as follows: " The mayor may, upon

any emergency or riot, pestilence or invasion, or at any time when he shall deem it necessary for the peace, good order and health of the city, appoint special policemen for a specified time, not exceeding two days, without the approval of the city council." This was the only provision contained in the charter giving to the mayor authority to appoint police except with the concurrence of the common council, and the only provision under which special police could be appointed. Some ordinances of the city were introduced in evidence from which a more enlarged authority might be deduced, but there was nothing in the charter which warranted the ordinances. Before Rust received his commission or attempted to act as a depot policeman, he had been hired by the depot company; he was afterwards paid by them, and was, in general, subject to their orders, superintendence and direction. He wore the uniform of an officer, and, perhaps, occasionally received orders from the chief of police of the city, and, in accordance with a direction which he received from the chief, turned over whomsoever he might arrest to the general police of the city, who afterwards confined them, if need be, in the city jail. But, notwithstanding these facts, it may be said that he was under the control and direction of the depot company and its superintendent, who hired and discharged men who acted in this capacity.

When the depot was built, a cell had been constructed in the basement about eight by ten feet in size. It had no outer window and was entered from the engine room, in which there was a small gas jet; this furnished the only light, and it reached the cell through a small hole cut in the door. The cell was empty save for some old blankets. Without permitting Smith to turn over the checks which he had collected on the train to any of his co-employees, Rust took him down to this cell, incarcerated him, and did nothing further concerning it except to notify the man relieving him that he wanted Smith turned over to the city policeman when he should come round. Smith remained in

the cell for about an hour, and was then by Rust's successor turned over to Price, one of the regular police officers, taken up to the city jail, and put into what is termed a "bull pen," which is an unfurnished cell about six feet wide and fifteen feet long with a row of cells on either side. The other occupants were negroes and drunken men, and the place was dirty and noisome. Here Smith stayed until midnight, when he was released on bail. In the morning Rust filed a complaint before the police magistrate, charging Smith with a violation of the ordinance prohibiting the soliciting of passengers for carriages without a license. Smith was tried and acquitted, and thereupon brought this suit against the company to recover for the false imprisonment.

The case has been tried three times. The jury disagreed on the first trial, and on the second rendered a verdict for Smith of $5,000, which was set aside by the court as excessive. The judgment appealed from is for $3,000, which was the amount of the last verdict.

Messrs: TELLER & ORAHOOD, for appellants.

Messrs. PATTERSON & THOMAS, for appellee.

BISSELL, C. The offense for which the arrest was made was committed, if at all, by the violation of a municipal ordinance. To settle the rights of the plaintiff and determine the responsibilities of the defendant, the *status* of the individual who made the arrest must first be ascertained. The radical difference between the powers and duties of a regularly constituted police officer and those of a private person in respect of these matters make the inquiry fundamental and primary. A private individual could never take a person into custody or restrain him of his liberty because of the commission of such an offense. It was only in emergencies and because of the right of society to defend itself against sudden assaults that the private person might act. It is otherwise with an officer; he may arrest

when he has reasonable grounds to suspect that a felony has been committed, and justify by proof of a ground which the law deems reasonable. The defense of an individual, however, must rest upon proof both of a reasonable ground and of the actual commission of the felony. This has been the law from the very earliest times. 1 Hale, P. C. 587; *Beckwith v. Philby et al.*, 6 Barn. & Cress. 635; *Neal v. Joyner*, 89 N. C. 287; *Rohan v. Sawin*, 5 Cush. 281; *Burns v. Erben*, 40 N. Y. 463.

This rule has never been extended so as to protect the officer in case of an arrest for misdemeanor except it be committed, or his information concerning it be acquired under particular circumstances. Cooley on Torts, p. 174, and notes.

Wherever the right of a police officer to arrest for a misdemeanor has been conceded, it has not been held to include an authority broad enough to embrace arrests for violations of municipal ordinances. To justify the arrest by an officer for an offense of this description, a statute must be found clothing the officer with the right, which must be exercised under the circumstances designated by the enactment. Doubts have been expressed as to the constitutionality of the legislation upon this subject; but it may now be said to be fairly well settled that an ordinance of this sort will be taken as a ground of authority to the policeman, where jurisdiction on this matter is expressly conferred by the general law of the state. *White v. Kent*, 11 Ohio St. 550; *Pesterfield, etc. v. Vickers*, 3 Coldw. 205.

A statute upon this subject has been enacted in this state, and doubtless a policeman would be authorized to make an arrest for a violation of a municipal ordinance where the offense was committed in his presence.

Such being the law, the importance of the preliminary inquiry as to Mr. Rust's position becomes evident. The question is disposed of in two ways. In the first place it is practically settled by the verdict of the jury, to whom was submitted the question, whether or not at the time of the

arrest Rust was acting as a special policeman under and
by virtue of the commission and appointment, or whether
he was acting as a representative and agent of the depot
company.   Upon this issue the jury found directly against
the appellants, and their verdict upon this subject may well
be accepted as conclusive upon this appeal.

The evidence clearly tended to show that at this time
Rust was in the employ of the depot company, which hired
him and paid him his wages, and that practically he was
under their orders, direction and control.   While it may be
true that in some minor particulars he took orders from
the chief of police with reference to the disposition of the
prisoners, and the time and way in which they should be
turned over to the regular officers, in general he was under
the direction and control of the superintendent of the depot
company, to whom alone he looked for instructions, and
whose orders he chiefly obeyed.   As the evidence fully jus-
tifies the verdict, the court would not feel at liberty to dis-
turb the finding regardless of the question of law involved
in the matter.   It is equally true that, as a matter of law,
it cannot be held that Rust was a policeman acting as such
at the time of the making of the arrest. · Whatever power as
a police officer Rust had must be taken to be conferred by
the commission which was issued to him by the mayor.
This warrant would not clothe him with the authority of
a police officer in the absence of power in the mayor to
make the appointment; nor in the absence of this appointive
power can the commission be taken as conclusive evidence
of his right to assume the functions with which it appar-
ently invests him.   In 1883 the legislature granted a new
charter to the city of Denver, which was in full force in
April, at the time of Rust's appointment.   The charter pro-
vided for the establishment of a police department and de-
fined the rights of the mayor in this respect.   Article 5
contains whatever there is in the charter upon this subject.
Its various sections contain a full statement of the requi-
sites for the creation and organization of the police force of

the city.  It delegates to the mayor whatever of authority
he had to create or appoint a policeman, special or general.
A casual examination of the charter will demonstrate that
at the time the mayor issued the commission to Mr. Rust
he had no power to appoint a special policeman, except
under certain emergencies and for certain designated pur-
poses and for a certain period of time.

It is idle to contend that a power of appointment may
be looked for in the ordinances adopted by the city, for a
municipal government would be powerless to confer upon
the mayor an authority greater than that expressed in the
charter.  The authority of a municipal government over
matters of this description is always defined by the statute
and circumscribed by its limitations.  In this case the char-
ter confers authority solely upon the mayor in respect of
this matter, and it must be taken that as to it the munici-
pal government is without the power of restriction or ex-
tension, for nowhere in the statute is this power expressly
granted to it.  The power thus conferred upon the mayor
is evidently not broad enough to include the right to ap-
point a special policeman for an indefinite period without
confirmatory action on the part of the council, which must
be held essential to the continued duration of a commission.
Under these circumstances the defendant company failed to
make the proof necessary to this defense.

When they undertook to defend that which was plainly
established to be a wrong committed with their assent and
by their direction, and by one of their duly constituted
agents, the burden was upon them to show that the indi-
vidual thus acting was protected by the authority produced
in his behalf.  It is evident that this defense was not estab-
lished because the mayor who issued the commission was
without power to thus commission a special police officer,
and that Rust's authority under the commission could not
continue up to the time of the arrest.  It is further evident
that there was a failure of proof in this respect, because
wherever there is a limitation upon the power of an official

who attempts to act, the evidence of his action must be presumed to be only of an act done subject to the limitation; and where parties contend that the appointment was confirmed by the common council, whereby their agent became a general police officer, with full powers as such, it is incumbent upon them to make proof of that municipal action which is essential to the creation of the authority.

It is contended upon argument that the commission was conclusive upon the question of the existence of the authority which it apparently delegated, and that it must be presumed to have been issued under those circumstances which are essential to the exercise of the power of appointment. However true this may be, and however applicable it may be under certain circumstances, it cannot be conceded that the courts are without the right to investigate the existence and extent of the power of appointment in the executive who undertakes to exercise it. The authorities which hold that the commission presupposes the regularity of all proceedings antedating it proceeds upon the hypothesis that the executive issuing the commission is clothed with the power which he has attempted to exercise.

Wherever the statute contains an express limitation upon the power, and the appointment is shown to be within the prohibition expressed, or wherever an appointment may be made with or without a limitation of time for its duration, the commission cannot be taken as conclusive evidence, either of the legality of the appointment or its duration. The contention, in this particular, might easily be conceded, and yet it be held that it is incumbent upon the defendant, when he makes a defense by commission under these circumstances, to make proof which shall show it to be a continuing and existing authority.

Rust was in the simple position of an agent of the depot company, acting in their behalf and by their direction, and without such police authority or right as is essential to a successful defense in an action for the unauthorized arrest. That a corporation is responsible for a wrong committed

by their agent acting in their behalf and under their authority is well established, and the reasons supporting the doctrine need not be expressed. *State v. Morris & Essex R. R. Co.*, 23 N. J. L. 369; *D. & R. G. R. R. v. Harris*, 122 U. S. 597; *Krulevitz v. Eastern R. Co.*, 143 Mass. 288.

It is insisted that the verdict is excessive, and that for this reason the judgment should not be permitted to stand. A very strong argument in favor of this contention is based upon the necessity which exists in all large cities to control and regulate the traffic carried on at its railroad terminals. The right of corporations in control of depots and railroad terminals to make rules and regulations for the due restraint and control of the business within those limits must be conceded. The immense number of passengers and the enormous amount of baggage which must be disposed of, the outside aids absolutely essential to the due transaction and proper handling of this traffic, necessitate the concession that the company must have the right to make such rules and regulations as may, by experience, be found essential to its control, regulation and safety. The absence of any necessity for the course pursued in this case is an answer to the contention that the affirmance of this judgment will result in the abrogation of all authority to control and regulate railroad traffic at such points. At the time that the arrest was made there was no attempted interference with either the property of the corporation, the privileges of its officers or agents, or the rights of any passengers. So far as the case discloses, if the carriage of passengers was solicited by the plaintiff, under the direction of the Denver transfer company, it was not done at the depot, but upon the train, and not within the limits of the municipality. The right to do this identical thing had been continually asserted by the transfer company and its agents whenever it was denied by those who represented the depot corporation. The difference of opinion on this subject had resulted in numerous arrests, and the complaints filed against the persons arrested had been dismissed as often as

they were brought to a hearing. There was nothing, then, in the circumstances which required immediate action on the part of the depot authorities, either to save the passengers from annoyance or to protect the company in its rights. The argument *ab inconvenienti* falls to the ground, :and it remains to determine whether, under the general rules covering this class of cases, the verdict should be taken as excessive. The situation of the controversy seems to furnish an answer to the argument. The case has been thrice tried. The first trial resulted in a disagreement; the other two trials resulted in a verdict for the plaintiff. The first verdict was for $5,000, which was set aside and the case again submitted to the jury, which assessed the damages at $3,000. Whatever may be the personal judgment of this tribunal as to the extent of the injury, these successive verdicts ought to control the determination. *Interest reipublicæ ut sit finis litium.* It is a case peculiarly within the province of a jury. Their right to assess the damages within any apparently reasonable limit ought not to be interfered with. An examination of all the cases upon both sides of this question clearly demonstrates that there is no uniform rule by which the amount of damages can be measured. There is the widest diversity of opinion among the courts as to the judgments which shall be allowed to stand. The range is wider, probably, in such cases than in any other. *Richmond v. Roberts,* 98 Ill. 472; *Draper v. Baker,* 61 Wis. 450; *Ga. Southern R. R. Co. v. Biglow,* 68 Ga. 219; *I. & G. N. R'y Co. v. Gilbert,* 64 Tex. 536.

The current of authority will not support the contention that the verdict is excessive.

It was a most unwarrantable interference with the personal liberty of a citizen under circumstances indicating an oppressive use even of a supposed authority. The law would have been as well vindicated, the rights of the public conserved, and the corporation protected in the transaction of its business by a prosecution in the regular courts. Under these circumstances, and in view of the large discretion left with juries as to the damage which shall be allowed in

cases of this description, the verdict cannot be disturbed. These considerations dispose of all the questions that require discussion.

Exceptions were taken to rulings upon the admission and exclusion of testimony, and to some of the instructions which were given to the jury. Under the principles expressed in this opinion these objections were not well taken, nor are they deemed of sufficient general importance to necessitate a discussion to sustain the action of the trial court in these particulars.

There are no errors apparent which will necessitate a reversal, and it is recommended that the judgment be affirmed.

RICHMOND, C., concurs.

REED, C., dissents.

PER CURIAM. We have decided to adopt the conclusions reached by the honorable commissioner in the foregoing opinion upon such matters as are essential to sustain the judgment of the court below. While the damages are unusually large for such a case, we do not feel warranted under the circumstances in disturbing the judgment of the court below on this account. Three different juries tried the case, two returning verdicts, the first verdict being almost double the one before us. It is only when the amount of the damages found by the jury is so great or so small as to clearly indicate that they were influenced by passion or prejudice that courts of last resort will interfere. Some deference should also be paid to the action of the trial judge, who hears the testimony of the living witnesses. The weight of his opinion supporting that of the jury is an additional reason for not interfering upon appeal. It has been said that in such cases the wrong must be very gross and the damages enormous for the court of review to interpose upon the ground of an excessive award. The judgment of the court below is affirmed.

*Affirmed.*