C. HOBBS, Appellee, v. ILLINOIS CENTRAL RAILROAD COMPANY et al., Appellants.

**PLEADING:** Amendments—Division Into Counts. Pending motion 1 for directed verdicts, amendments are proper which do no more than to divide the petition into counts.

**LIMITATION OF ACTIONS:** Computation of Period—Amendments 2 Pleading New Cause of Action, Etc. No new cause of action is pleaded by an amendment which simply divides a petition into counts, and amplifies the former statements thereof.

**EVIDENCE:** Relevancy, Competency, and Materiality—History of 3 Transaction. The natural incidents of a case,—those things which, within proper limits, constitute the history of preliminary transactions leading up to and explaining the one on which the action is based,—are always admissible.

APPEAL AND ERROR:   Right of Review—Overruled Motion for Directed Verdict—Waiver.  Motion for directed verdict at close of plaintiff's testimony must, if overruled, be *renewed* at close of defendant's testimony, or waiver results.

PRINCIPAL AND AGENT:   Power of Agent—Authority to Arrest Embraces Authority to File Information.  Authority of a railroad detective to make arrests for criminal disturbances on the grounds of the company, necessarily embraces the further power to do that *which will make the arrest lawful*: to wit, file information for the prosecution of the offender.

SALINGER, J., dissents.

PRINCIPAL AND AGENT:   The Relation—Policemen Acting for Railroad Company—Jury Question.  No *conclusive* presumption necessarily arises that policemen, duly appointed by the public authorities of a city, act, in the performance of their duties. *for and on behalf of the city.*

PRINCIPLE APPLIED:   Two men were employed and paid by a railway company as special watchmen.  They were duly appointed and sworn in by the proper city authorities, and were detailed to act as special officers for the company; but just who detailed them does not conclusively appear.  They did not report to the city, nor to the city chief of police.  The city did not fix their hours of work.  The two men were under the supervision and control of a special agent of the company, who, in turn, received his orders from other superior officers of the company.  These two policemen made an arrest, but whether for violation of city ordinance or state law does not appear.  In an action for false arrest, the court allowed the jury to say whether, in making the arrest, the policemen were acting for the city or for the railroad company.
*Held,* proper.

PRINCIPAL AND AGENT:   Powers of Agent—Acts Within Scope of Employment But in Disregard of Orders.  So long as an agent acts within the *scope of his employment*, it is immaterial that he acts willfully and in disregard of orders.

MALICIOUS PROSECUTION:   Termination of Prosecution—Dismissal by County Attorney.  Voluntary dismissal of a criminal action by the county attorney is a termination of the cause for the purpose of an action of malicious prosecution.

ARREST:   Mode of Making—Non-Necessity for Force or Physical Restraint.  Actual force or visible physical restraint is not necessary in order to make a valid arrest.

**APPEAL AND ERROR:** Assignment of Error—Errors En Masse.
10  An assignment to the effect that the court erred in refusing to
give each and every one of 24 different requested instructions
will be wholly disregarded.

**EVIDENCE:** Relevancy, Competency, and Materiality—Non-Issua-
11  ble Matters. Whether plaintiff, in an action for malicious pros-
ecution, was, at a time prior to the arrest in question, a pas-
senger or a trespasser on defendant's train, is wholly immate-
rial when such prior time was not issuably connected with said
arrest.

**APPEAL AND ERROR:** Parties Entitled to Allege Error—Invited
12  Error. Inviting error precludes subsequent complaint.

**MALICIOUS PROSECUTION:** Actions—Arrest Without Warrant—
13  Justification—Burden of Proof. One who arrests without a war-
rant must justify the arrest.

*Appeal from Cherokee District Court.*—W. D. Boies, Judge.

DECEMBER 21, 1917.

ACTION to recover damages for false arrest and for malicious prosecution of the plaintiff by the defendant and its agents. Trial to a jury, verdict and judgment for plaintiff, and the defendants appeal.—*Affirmed.*

*Molyneux & Maher, Helsell & Helsell, Blewett Lee,* and *W. S. Horton,* for appellants.

*McCulla & McCulla, Healy, Burnquist & Thomas,* and *F. F. Faville,* for appellee..

PER CURIAM.—I. The petition, which was originally in a single count, charged the defendant railway company and two of its alleged servants, who are also made defendants, with having falsely arrested the plaintiff for disorderly conduct; that they thereafter, maliciously and without probable cause, caused an information to be filed before a police judge in the city of Fort Dodge, and thereafter again caused plaintiff's arrest; that the case was prosecuted to judgment before the police judge, resulting in his finding the plaintiff guilty; that plaintiff thereupon prosecuted an

appeal to the district court of Webster County, where the action was terminated by the dismissal of the case and the plaintiff's discharge; that the entire prosecution and the arrest were without probable cause, and were wanton and malicious.   Defendants filed a general denial, but in effect admitted the arrest and the prosecution; pleaded that they had reasonable cause therefor; that the plaintiff and others were in fact guilty, and were convicted of the offense charged before the police judge aforesaid; and that he (plaintiff) has never been legally acquitted of the charge.   They also pleaded that the prosecution was never legally ended or concluded.   At the conclusion of the introduction of the testimony on the part of the plaintiff, defendant moved the court for a directed verdict; and, while the motion was pending, plaintiff amended his petition by separating the same into counts, in the first of which he charged a false arrest, on the 17th day of December, by the defendant and its agents, and in the second, he charged them with having maliciously prosecuted the plaintiff before the police judge, and having thereafter falsely arrested plaintiff and continued his prosecution wantonly, maliciously, and without probable cause, down until he was discharged upon the appeal, as stated in the original petition.   Defendants objected to the filing of this amendment because it came too late, and for other grounds; but these objections were overruled, and defendants then demurred, because the amendment introduced new causes of action, and that these were barred by the statute of limitations.   This demurrer was also overruled, and exception taken.   It was then agreed that defendants' original answer should apply to the amended petition, and the cause proceeded.

Such, in brief, were the issues on which the case was tried; and down to this point, no question arises, save the correctness of the rulings of the trial court on objections

1. PLEADING:
amendments:
division into
counts.

and demurrer to the amendment to the petition. These rulings may be considered together. The original petition, which was in a single count, contained two, if not three, causes of action: one for malicious prosecution, and one, if not two, actions for false arrest, one before the filing of the information, and the other after the information was filed; and the amended petition did no more, as we think, than to separate and divide two of these causes of action into counts, the first one charging false arrest before the information was filed, and the second, malicious prosecution and false arrest after the information was filed. Even were this not true, it was within the discretion of the trial court to permit the filing of the amendment in furtherance of justice, unless defendants were in some way prejudiced thereby. No such prejudice is shown. Defendant's demurrer, based upon the ground that a new cause of action was introduced by the amendment, which cause was barred by the statute of limitations, is without merit. *Gordon v. Chicago, R. I. & P. R. Co.,* 129 Iowa 747; *Frazee v. City of Cedar Rapids,* 151 Iowa 251, 256; *Russell v. Chicago, R. I. & P. R. Co.,* 160 Iowa 503; *Chariton Nat. Bank v. Whicher,* 163 Iowa 571. The original petition covered all the matters referred to in the amendment, in a general way, and the amendment was but an amplification thereof, the matters pleaded being germane to the cause of action stated in the original petition.

2. LIMITATION OF ACTIONS: computation of period: amendments pleading new cause of action, etc.

II. The arrests and the prosecution grew out of a trouble arising between plaintiff and a number of his companions, and the railway company and its employees, over transportation by the company of the said parties as caretakers of live stock over its line of road to Chicago. Plaintiff and other men, 11 in number, residents of Marcus and Cleghorn, in Cherokee County, shipped, over defendant's

line, some live stock from these respective towns to Chicago, and were given stock passes to accompany the stock. They were joined by other stock shippers on defendant's line before the train reached Fort Dodge, and the party amounted to 24 or 25 men, aside from the train crew, when the train reached the latter station. They were crowded into a single caboose, or way car, and some of them had to stand up while riding on the train. The train arrived at Fort Dodge at about 5 o'clock in the morning of December 17, 1911, and the men immediately went to a lunch counter for breakfast. The men endeavored to secure a second caboose, or way car, from the defendant company, and went to its yardmaster for that purpose. They were then directed to the train dispatcher, and he told them that they could not have another car. The stock train was then standing in the yard, and the men were advised as to the departure thereof; but the plaintiff and some 11 others neglected or refused to take it, because of the crowded condition of the way car. About this time, a passenger train came in on defendant's line, destined to Chicago, and due to leave Fort Dodge at 6:25 A. M. The plaintiff and his companions, with the implied assent of the brakeman of this train, entered the forward car of the train, which was a combination baggage and passenger car. The conductor of the train was not present at this time, but when he appeared, he was informed that the men were on the train expecting to ride on their stock contracts. The conductor then went to where the men were, and, according to one of the witnesses, the following occurred:

"We went in and sat there for a couple of minutes before the conductor came in; then he wanted to know if we were stockmen and if we had tickets. We told him we had no tickets, and he said we couldn't ride in that train; and Mr. Hobbs spoke up and said we had transportation, and the conductor replied that that kind of transportation didn't go on this train. He went to the rear end of the coach

and went out for a little while, then came back and asked us if we had gotten tickets, and we replied we hadn't. He said if we didn't get tickets, he would go and get officers to put us off. In a few minutes, he came back with the officers, and stopped opposite Mr. Williams, and asked if he was one of the stockmen. He told him he was; then he told Mr. Williams to get off. Mr. Williams then said if he was going to put us off, to start down at the head, and he pointed down to me. Then he came to where I was and asked me if I was one of the stockmen, and I told him I was, and he told me to get out. I didn't move, and he took hold of me. As soon as he did that, I asked him to show me his authority as an officer, and he pulled back his coat and showed me his star. Then I got up and started out; so did Mr. Williams and most all the rest, and at this time Mr. Hobbs remarked that we had never refused to pay cash fare, and there were one or two others that said we would pay cash fare. Then the train dispatcher spoke up and said, 'That is all right; if the boys want to pay cash fare, let them go on.' Mr. Core and Gressley then turned to Joyce, the conductor, and asked him what they should do and he said, 'Put them off.' I was probably the second or third out."

The conductor said, on cross examination, in referring to this matter:

"Up to that time, I haven't asked or requested any of the other passengers upon the train for their tickets. I wasn't engaged in the business of collecting cash fares or tickets at the time I had this conversation with those Marcus people."

Defendants Core and Gressley, who are referred to in this and other testimony which we shall quote, were employed and paid by the railway company for their services, and were secured to take charge of the defendant company's depot yard and roundhouse in Fort Dodge, as special watchmen. They were sworn in as special policemen by the po-

lice judge of the city, and detailed to act as special officers for the Illinois Central Company. They received no pay from the city, and did not report to it or to the chief of police. After the conductor had told the men that they could not ride on his train, on the stock contracts, and that they would have to get off and get tickets, or he would get officers and put them off, he (the conductor) left the train, and soon appeared with the two policemen hitherto mentioned. The policemen mounted the car in which the men were seated, and immediately said: "You will have to get out of this car." One of the plaintiff's party said: "If we have to get out, you want to start at the front end of the stock train, and we will all go together." A witness thus detailed what followed:

"They wanted to know where the head parties were, and I referred them to Mr. Burch. Mr. Walter Hobbs was directly across the aisle, Burch was on the south side, and Chester Hobbs on the north side. They went up to Mr. Burch, and said, 'You will have to get out;' and he said, 'I want you to show me your authority.' One of the men pulled back his coat and showed his star. Burch then got up and prepared to go out. He picked up his baggage and started for the west end of the car, and I followed him. As I recollect, Chester Dewar was ahead of me. When I got up, Chester Hobbs was still in his seat, and Walter Hobbs had not started when I started down the aisle. I didn't look back after I started out. I walked right down off the car. After I got down onto the platform, I walked up a ways from where the train stood towards the depot, and I stopped about 40 feet from the car and turned around to see if the crowd was coming, when I discovered that Joseph Hobbs had fell down right where he had stepped from the vestibule, and I saw one of the officers come right down off the steps and saw him strike Mr. Hobbs on the head with something that looked like a club. I saw the other police-

man step down, and by that time, Walter Hobbs stepped in there to protect Joseph Hobbs. I saw this other policeman raise his hand when Walter Hobbs stepped in, then I saw Walter grab at something—I couldn't just tell for sure what, because his back was towards me. When I looked back, Joseph Hobbs was just about at the back part of the steps. The policeman that was pounding Joe was standing to the east of him, and when Walter Hobbs came off the steps, he was north of where Joe was. This second policeman came in on the north side of the first man that was fighting Joe. He stepped down off the steps, and I think had maybe about three feet to step back to where they were, and raised his club and Walter grabbed for it. I didn't see Chester Hobbs there at that time at all. The other men were standing around there directly to the north or a little to the west, with the exception of Chester Dewar, and he was very close to where I was. Then I turned around and started to the door. I was a little more than half way there. The west part of the door, as near as I can estimate, was about even with the back end of the car. I should judge from the train to the depot it was about 50 feet. Just as I started toward the depot, I heard a man say, 'Hit that big son of a bitch,' and walked probably five or six feet when I was hit. I was hit alongside of the head right by the ear. I don't know what I was hit with; I was knocked down, and I stayed there until I regained consciousness and was able to get up. I was hit right on the side of my head above the ear. After I got up, I went to the depot. All of our crowd was there with the exception of Louis Duccommon— I didn't see him. Directly after I got onto my feet, I saw Joseph Hobbs standing there, and the policeman says, 'You damned son of a bitch, you are under arrest;' and the policeman said, 'You people go into the depot,' Just after I started to the depot, the train pulled out, and just as it passed by, the policeman said, 'You big son of a bitch, I

ought to have shot you and I have a notion to shoot you yet, now you are under arrest. Go to the depot.' * * * Both policemen went in, and so did Chester Hobbs; and the policeman said to Mr. Hobbs, 'Sit down there, you damned son of a bitch.' Walter Hobbs spoke up and said something, and the policeman said, 'You damned son of a bitch, sit down; you are under arrest.' This was in the waiting room of the depot, right next to the restaurant. The policeman kept cussing and swearing. They cussed Joe Hobbs and Walter Hobbs, and called them damned, dirty sons of bitches for some little time. Mr. Ritemeyer spoke up and said, 'You will have to quit using that language here; cut out this cussing.' He said that to the policemen. Part of this time, I was walking around. I went back to the water-closet once, and came back and sat down, and then I would get up and maybe walk over to some other seat, and talk to some of the shippers. I stayed there probably an hour. There was no hitting or striking done in the depot by any-body. The patrol wagon came then. Some man came in there and talked with Core and Gressley. I was back a little ways, and didn't hear what was said. After this con-versation, the policeman said, 'Consider yourselves all under arrest.' He said this after talking to those two men private-ly. Then Core and Gressley went to picking out the ship-pers. I was one of those selected, and so was Chester Hobbs. I started for the patrol wagon, and the rest of the boys came right along. This transaction I am speaking of took place in the waiting room. We went out of the depot through the north door, and got into the patrol wagon."

Plaintiff testified:

"I was sitting near the center of the car, and Mr. Burch was right across the aisle. The other people from Marcus were back of us. We all proceeded to leave the car. I was the last one out. I had my grip and two overcoats—one was my own, and the other, father's. Immediately after leaving

the car, I saw Core and Gressley, who had my father by the hand. Then they took us into the depot. Before that, Core and Gressley were swearing. They said, 'You son of a bitch, I would like to shoot you and I will shoot you, you son of a bitch.' They said that to my father. They had policemen's billies in their hands. On the way to the depot Core and Gressley kept swearing. They kept calling us sons of bitches, and said, 'I would like to shoot a hole through you;' that they ought to shoot a hole through us. All of us went to the depot, the stockmen and the policemen. We were put under arrest in the depot. * * * From the time that I got off of that stock train that Sunday morning in Fort Dodge until I left for Chicago, I didn't strike any person nor use any vulgar or profane language nor engage in any quarrel, controversy, or dispute with any person, nor have any fight or argument. When the conductor came with the officers, they all got up together to go out. I can't say who was first. There was no racket or row on the car nor on the platform. I came out last; they were all off the platform when I went down. * * * I got onto the platform before I saw any force used on anyone or knew of any force being used on anyone. When I came down, the platform was cleared. I didn't see any striking out there on the platform. There was some little excitement after I got off. The rest were standing around the platform; there was no row going on. I didn't see any of the striking. When we got off, one of those policemen had my father by the hand, just about one third or one half way east of where we got off. I picked up my father's cap and gave it to him. I didn't see anyone strike my father. * * * I saw them when I got off, but there was no racket going on. I didn't know a thing about anybody being hit until after I got off. I learned that as soon as I got in the depot. We went in there in a few minutes. It was probably five minutes after I got off the car before I knew of any row. After the policemen let go

of my father's hands they went into the depot. I didn't see that my father was bleeding any; he didn't complain any before he got into the depot,—he did after he got in there. * * * I went with the rest of the crowd into the depot, and the police patrol wagon came after we had been in there probably half an hour. The police officer was a big fellow, and had on a policeman's suit of clothes. Mr. Burch asked those police that were on the train to show their badges, and they did so immediately. They wore stars, and said they were policemen, and I left the train and obeyed them on the platform and in the depot because I thought they were policemen; and I went down town in that patrol wagon because I thought it was the city patrol under the command of those policemen. * * * I couldn't say who it was that put us under arrest. We were arrested in the depot. I think it was one of these men, either Core or Gressley,—he didn't have any warrant. The man that came down and put us in the wagon didn't tell us that he had any warrant. I don't know whether he had one or not."

After the arrest spoken of, the men were taken to the police station, and there put up a cash bond for their appearance on the following Tuesday. On Monday, December 18, 1911, M. L. Bull, a special agent for the defendant company, filed an information before the police judge, charging plaintiff and nine others in a single information with disorderly conduct. The record before the police judge shows that a trial was had on December 19th, and all of the defendants except one were found guilty. An appeal was immediately taken to the district court, and bonds given. When the police judge came to his transcript, he made out as many as there were parties defendant, and filed these with the clerk of the district court. A case was docketed in the district court against this plaintiff; and before it came on for trial, the city attorney appeared in the case and filed

a motion to dismiss, on the ground that, in his judgment and opinion, the cause should not be further prosecuted, and that the defendant should be discharged, and his bond exonerated.

The matter then came on before the district court; and upon the motion of the city attorney, the case was dismissed, and plaintiff herein was discharged and his bond exonerated. The costs were paid by the city, and thus that prosecution ended. M. L. Bull, the party who filed the information, was a special agent for the defendant company, who testified regarding his authority as follows:

"The general character of my work rendered the company includes the investigation of offenses perpetrated against the company. At the present time, I have one man under me. I recall a disturbance here in Fort Dodge in the fall of 1911 and the early part of 1912, particularly in reference to some employes of the company not working in the shops or roundhouse. During the strike trouble, I think I had five men. I received my instructions from Tim K. Keliher of Chicago, and from the superintendent of this division. I recall the month of December, 1911, when some of these men from Cherokee County were arrested. I signed the information before Mr. Magowan upon which these men were arrested. I had no special directions in connection with the filing of that information or arresting those men, except the exercise of my own best judgment there at the time."

He also testified as follows, regarding Core and Gressley:

"Q. What do you say, Mr. Bull, as to whether or not a man named Core and a man named Gressley were under your supervision and control in any way at that time? A. They were."

It should also be stated that, after the information was filed, the men were arrested and taken before the police judge. These, in brief, are the facts upon which plaintiff

relies. Some of them are contradicted by the defendants'
witnesses, but the conflict thus produced was for a jury,
under proper instructions. The jury, in answer to special
interrogatories, made the following findings:

"Interrogatory 1.—What amount, if any, do you allow
the plaintiff on Count one of his petition, being the action
for false arrest and illegal detention? A. $350.00.

"Interrogatory 2.—What amount, if any, do you allow
plaintiff on Count 2 of his petition, being the action for
malicious prosecution? A. $775.00.

"Interrogatory 3.—Do you find that the plaintiff was
prosecuted in the police court action without probable
cause? A. Yes.

                                    "Ben Hall, Foreman."

III.  In addition to the matters already referred to, ap-
pellants rely upon 17 propositions and 68 alleged errors.
Their argument, however, is confined to 36 points, and many
of these are duplicated. Many of the propositions relied
upon are conceded, but it is claimed by the appellee that
they have nothing to do with the case. It is apparent that,
in an opinion of any reasonable length, it would be impos-
sible to treat each and all of these propositions in de-
tail, and we shall only deal with those which are deemed
important and controlling.

3. Evidence:
relevancy,
competency.
and material-
ity: history
of transac-
tion.

It is contended that the trial court was
in error in allowing any testimony as to
what was done by plaintiff or his compan-
ions before the conductor of the passenger
train arrived upon the scene, and that ev-
erything transpiring before that time, regarding the crowd-
ing of the caboose and plaintiff's conduct before his entry
upon the passenger train, was immaterial, and extremely
prejudicial to defendant. We think the testimony was prop-
erly admitted, and explanatory of the entire transaction.

Without it, the true history of the case could not be before the jury, and the nature of the acts relied upon as constituting the cause of action could not be understood. Again, it is said that the trial court erred in permitting plaintiff to show an arrest before the informaton was filed, for the reason that no claim is made in an original petition on account thereof. This is an error. The petition expressly charges a false arrest on December 17th, before the filing of the information, and also a subsequent arrest. Even were this not so, testimony as to the first arrest which was part and parcel of the transaction was properly received.

**4. APPEAL AND ERROR: right of review: overruled motion for directed verdict: waiver.** IV. Error is predicated upon the court's refusal to direct a verdict for defendants at the close of plaintiff's testimony. As the defendants did not stand thereon, but proceeded to introduce their testimony in defense, they waived their motion, and cannot be heard to say that there was error in ruling. This has been so many times affirmed that we shall not cite authorities in support of the proposition.

**5. PRINCIPAL AND AGENT: power of agent: authority to arrest embraces authority to file information.** V. It is contended that Core and Gressley were not the agents or the servants of the company, and that for their acts the defendant company is not responsible. In addition to the testimony of the witness Bull regarding his control over these men, they testified as follows:

Core testified:

"At the time of the trouble down there, I didn't have any acquaintance with Mr. Ritemeyer nor with Mr. Joyce. My hours of employment were from 6:00 in the evening until 6:00 in the morning. So far as I was hired to watch for the railroad, I was at liberty to leave there at 6:00 o'clock. (Ritemeyer and Joyce were the trainmaster and conductor of the train.) He (Bull) told me that what was wanted of

me was to watch the property of the railroad company. He told me that would be my duty, and that, if I saw anybody stealing or mistreating the property of the railroad company, I was to arrest them; and he said, if any trouble arose among the men, to stop that—if any trouble arose on the railroad ground, was the way he stated it. This morning before that trouble, I had come in to quit work. I came through the yards the same as I always did, * * * to wait for the street car—I had my lunch with me. Mr. Ritemeyer came into the depot lunch counter, and they pointed me out as an officer. He said that I should come out to the train; that there was a bunch of men on there that wouldn't pay their fare and wouldn't get off, and he said to be as easy as I could with them, and not to use any violence, if I didn't have to."

Gressley said:

"I didn't receive very many instructions from Mr. Bull; I got most of my orders here from the chief of police before I went down there. Mr. Bull gave me some instructions. He told me my duty would be to look around the roundhouse and out through the yards, and to preserve order and keep the peace. If we saw anybody taking coal, or disorderly, drunk, fighting, or anything like that, we were to look after them."

It may fairly be inferred from the evidence that Bull was endowed with authority by the defendant company to investigate the offenses perpetrated against it, and to employ and direct others to guard its property, and arrest persons observed stealing or injuring any of the company's property or making criminal disturbance on its ground. Was authority on his part to make and cause to be filed informations charging such offenses to be implied from that so conferred? In passing on this issue, we are not to overlook the fact that Section 5208 of the Code provides:

"When an arrest is made without a warrant, the person

arrested shall, without unnecessary delay, be taken before
the nearest or most accessible magistrate in the county in
which the arrest is made, and the grounds on which the
arrest was made shall be stated to the magistrate by affi-
davit, subscribed and sworn to by the person making the
statement, in the same manner as upon a preliminary in-
formation, as nearly as may be."

That the duty of making and causing to be filed appro-
priate information devolves on the person making the arrest
cannot be doubted, but this does not preclude anyone else
from so doing. Anyone, on information and belief, may
do likewise, and it is not to be inferred that defendant com-
pany intended to leave to the watchmen employed by it to
guard its property the determination of whether, in
obedience to the statute quoted, the person taken in custody
should be prosecuted, or, on their failure or refusal to make
the necessary affidavit, that he be released. The more rea-
sonable inference is that the company, in causing the arrest
through the agency of Bull, so did with the design of bring-
ing the offending party to justice, and to do whatever might
reasonably be necessary to accomplish that purpose. The
arrest of a person accused of crime is but the preliminary
step in his prosecution, and lawful only when with that end
in view. It must be preceded or followed by information or
indictment, and one or the other is essential to such prosecu-
tion. The company, in authorizing Bull to cause arrests to
be made, must be presumed to have been aware of this, and
that, to justify an arrest for an offense such as that of which
plaintiff was accused, an information must be lodged against
the alleged offender, preceding or following such an arrest.
Bull's authority necessarily included within its scope, ex-
pressly or by implication, all that was essential to ac-
complish what he was directed by his principal to do. He
might cause arrests, and within that express authority is
necessarily implied that to make and file charges against

persons so arrested; for no arrest can be lawful unless preceded or followed by the filing of an information. That others may do this does not obviate the duty of those causing such arrest to see to it that this be done, to the end that the arrests caused to be made are lawful. We are of the opinion that Bull acted within the scope of his authority in filing the information.

6. PRINCIPAL AND AGENT: the relation: policemen acting for railroad company: jury question.

As to Core and Gressley, a somewhat different question arises, because of their being sworn in as special policemen by the city. We think, however, that it was a question for the jury to determine whether or not, in what they did, they were acting for their employer, the railroad company, or as policemen owing a duty to the city. That question was submitted to the jury, and the jury found that they were acting for the company. Appellants contend, however, that, as they were appointed policemen for the city of Fort Dodge, in making an arrest for violation of city ordinances or of the state laws, they must be conclusively presumed to have acted for the city, and not for the railroad company. This contention was answered in a somewhat similar case (*Kusnir v. Pressed Steel Car Co.*, 201 Fed. 146), wherein Judge Ray said:

"To establish a rule to the contrary would lead to the grossest acts of infamy and outrage, and destroy, as it ought, respect for government and courts. The state would not be liable for such acts, and if the employer,—that is, the master, who makes the officer his representative for his private purposes,—is not, because the wrongdoer is a police officer, such officer may perform the work he is employed to do in the most grossly careless, wanton, and willful manner, fraught with great peril to others, and the injured party must look to the wrongdoer, usually of no pecuniary responsibility, and not the employer, who employed the wrongdoer to do the very acts complained of, but not in a wanton,

willful, and negligent manner, a mode fraught with peril to others."

Again, in *Krulevitz v. Eastern R. Co.*, (Mass.) 9 N. E. 613. the court held, in a similar case, that it was a question of fact for a jury to determine in what capacity the officer acted. See also *Sharp v. Erie R. Co.*, (N. Y.) 76 N. E. 923 (6 Ann. Cases 250) ; *Heggen v. Ft. Dodge R. Co.*, 150 Iowa 313; *Southwestern Portland Cement Co. v. Reitzer*, (Texas) 135 S. W. 237; *Taylor v. New York & L. B. R. Co.*, (N. J.) 78 Atl. 169 (39 L. R. A. [N. S.] 122), opinion by Pitney, J.; *Nesbit v. Chicago, R. I. & P. R. Co.*, 163 Iowa 39.

In the *Southwestern Portland Cement Co.* case, the Supreme Court of Texas said:

"To render the master liable for the tortious acts of his servant, it is, as a general rule, sufficient to show that he gave to the servant authority, or made it his duty, to act in respect to the business in which he was engaged when the wrong was committed, and that complained of was done in the course of his employment. In such a case the master will be deemed to have consented to and authorized the act of the servant, and will not be relieved of liability, although the servant abused his authority, or was reckless in the performance of his duty, or inflicted an unnecessary injury in executing his master's orders. *T. & M. Ry. v. Dean*, 98 Texas 519, 85 S. W. 1135; *I. & G. N. Ry. v. Cooper*, 88 Tex. 607, 32 S. W. 517; *I. & G. N. Ry. v. Huggen*, 45 Texas Civ. App. 326, 100 S. W. 1003; *Milton v. M. P. Ry.*, 193 Mo. 46, 91 S. W. 949, 4 L. R. A. (N. S.) 283; *Conchin v. El Paso & S. W. Ry. Co.*, (Ariz.) 108 Pac. 260, 28 L. R. A. (N. S.) 88. Under the principle stated, if Malone had been a deputy sheriff of El Paso County, there could be no question as to the defendant's liability, in view of the uncontroverted evidence, as a matter of law, for the plaintiff's arrest and imprisonment, nor as to the correctness of the charge in so

pronouncing the law.   But where a person is in the employ
of and paid by a corporation, but has been appointed by the
proper authority as a deputy sheriff, as Malone was, the
question sometimes arises whether, in making a wrongful
arrest, he acts as the servant of his employer or as a public
officer; and, upon such question, there is a difference of opin-
ion, as shown by the authorities.   See *Beach Improv. Co. v.
Steinmeier,* 72 Md. 313, 20 Atl. 188, 8 L. R. A. 846; *Walker
v. S. E. Ry. Co.,* L. T. R. (C. P.) 14; *Foster v. Grand Rapids,
etc., Ry. Co.,* 140 Mich. 689, 104 N. W. 380.   The weight of
authority seems to be that a·corporation is liable for a·
wrongful assault or unlawful arrest made, or caused to be
made, by a detective or peace officer, employed by it in the
course of its business as a watchman or detective, although
he has been given police powers by the public authorities at
the request of his employer.   *St. L., etc., R. R. Co. v. Hack-
ett,* 58 Ark. 381, 24 S. W. 881, 41 Am. St. Rep. 105; *Dickson
v. Waldron,* 135 Ind. 507, 34 N. E. 506, 35 N. E. 1, 24 L. R. A.
483, 488, 41 Am. St. Rep. 440; *Evansville, etc., R. Co. v. Mc-
Kee,* 99 Ind. 519, 50 Am. Rep. 102; *Union Depot R. Co. v.
Smith,* 16 Colo. 361, 27 Pac. 329; *Harris v. Louisville, etc., R.
Co.,* (C. C.) 35 Fed. 116; *King v. I. C. Ry. Co.,* 69 Miss. 245,
10 Southern 42; *Eichengreen v. L. & N. R. Co.,* 96 Tenn. 229,
34 S. W. 219, 31 L. R. A. 702, 54 Am. St. Rep. 833; *Jardine
v. Cornell,* 50 N. J. Law 485, 14 Atl. 590; *Hershey v. O'Neill,*
(C. C.) 36 Fed. 168.   But it is held in some of these cases
that the rule must be carefully applied, and that the cor-
poration is not liable for the act of the police officer as such,
and not as a servant of the corporation.   Ordinarily the
question as to whether the wrongful acts were those of
the .officer or of the corporation is one of fact, and should
be submitted to the jury."

In *Taylor's case,* supra, the Supreme Court of New Jer-
sey, through Pitney, C. J., said:

"In our opinion, if railway policemen appointed and

commissioned under the act of 1904 are employed by the railroad company, or any other corporation or person, in matters aside from their duties under the statute, the principal may be held answerable for what they do, the same as in other cases of agency. Their commissions as railway policemen cannot be made a cloak to shield the company from responsibility for what may be done by such agents under the employment of the company, aside from the strict and proper performance of their duties as officers under the act."

The cases cited as reported in L. R. A. (N. S.) and Annotated Cases are fully annotated; and these annotations show the current of authority to be in accord with the quotations already made. See also *Deck v. Baltimore, etc., R. Co.,* 100 Md. 168 (59 Atl. 650) ; *Foster v. Grand Rapids Co.,* (Mich.) 104 N. W. 380; *Dickson v. Waldron,* (Ind.) 34 N. E. 506 (35 N. E. 1) ; *Illinois Steel Co. v. Novak,* (Ill.) 56 N. E. 966; *Jardine v. Cornell,* (N. J.) 14 Atl. 590; *St. Louis, I. M. & S. R. Co. v. Hackett,* (Ark.) 24 S. W. 881; *King v. Illinois Cent. R. Co.,* (Miss.) 10 So. 42.

In *Sharp's* case, supra, the New York court said:

"A railroad company employing a servant who happens to be a public officer acquires no immunity from such employment. Constables and policemen are often employed by corporations in the same capacity as Wheeler was. It is not beyond the province of a jury in such a case to find that the official acts of the employe are to be used for the benefit of the defendant and in protection of its interests or property. And, hence, in such a case, the character of the servant's act is to be determined in the same way and upon the same principles as if he was not a public officer at all. If he acts maliciously or in pursuit of some purpose of his own, the defendant is not bound by his conduct, but if, while acting within the general scope of his employment, he simply disregards his master's orders or exceeds his powers, the master will be responsible for his conduct."

In *Hedge v. St. Louis & S. F. R. Co.,* (Mo.) 145 S. W. 115, the same doctrine is announced.

VI.    In the same connection, it is argued that, even if defendant is to be held for the acts of Bull, Core, and Gressley, it should not be so held here, because they were not acting within the scope of their employment. A sufficient answer to this is a quotation from a recent case in this court, entitled *Nesbit v. Chicago, R. I. & P. R. Co.,* 163 Iowa 39, as follows:

7. PRINCIPAL AND AGENT: powers of agent: acts within scope of employment but in disregard of orders.

"A learned text writer, after a careful review of the authorities, thus stated the rule: 'It is not necessary, in order to fix the master's liability, that the servant should, at the time of injury, have been acting under the master's orders or directions, or that the master should know that the servant was to do the particular act that produced the injury in question. It is enough if the act was within the scope of his employment, and, if so, the master is liable, even though the servant acted willfully and in direct violation of his orders.    *    *    *    A master cannot screen himself from liability for an injury committed by his servant within the line of his employment by setting up private instructions or orders given by him, and their violation by the servant. By putting the servant in his place, he becomes responsible for all his acts within the line of his employment, even though they are willful and directly antagonistical to his orders. The simple test is whether they were acts within the scope of his employment—not whether they were done while prosecuting the master's business, but whether they were done by the servant in furtherance thereof, and were such as may fairly be said to have been authorized by him. By authorized is not meant authority expressly conferred, but whether the act was such as was incident to the performance of the duties intrusted to him by the master, even though in opposition to his express and

positive orders.' Wood on Master and Servant (1st Ed.)
585. The same author said: 'Without stopping to give fur-
ther illustrations from the modern cases, it may be said to
be well settled that the master is not only responsible for
the negligence or misfeasance or malfeasance of his serv-
ant in respect of the discharge of duties expressly imposed
upon him, but also in all cases where the act of the serv-
ant is within the scope of his implied authority, and in de-
termining this, the nature of the employment and the ends
and purposes sought to be attained are material elements,
and the real test of liability. *Prima facie,* when the act is
done which the master himself might have done, it will be
presumed that it was an act within the scope of the serv-
ant's authority, and the burden of proving want of author-
ity rests upon the defendant.' Wood on Master and Serv-
ant, 559. * * * Whether the servant was, at the time
in question, acting within the scope of his employment, or
outside of it, to effect some purpose of his own, is gen-
erally a question of fact for a jury, and its verdict is con-
clusive, provided there be any substantial testimony to sup-
port it. *Mott v. Ice Co.,* 73 N. Y. 543; *Cohen v. Dry Dock
Co.,* 69 N. Y. 170; *Schulte v. Holliday* [54 Mich. 73, 19 N. W.
752], supra."

See also *Deck v. Baltimore, etc., R. Co.,* 100 Md. 168
(108 Am. St. Rep. 399) ; *Evansville & Terre Haute R. Co. v.
McKee,* 99 Ind. 519; *Chicago City R. Co. v. McMahon,* 103
Ill. 485; *Heggen v. Ft. Dodge R. Co.,* supra.

The trial court instructed in accordance with these
views, and there was no error.

8. MALICIOUS
PROSECUTION :
termination
of prosecu-
tion : dis-
missal by
county at-
torney.

VII. Defendant insists that there is no
showing that the criminal prosecution has
ever been terminated as to plaintiff. This
contention is doubtless due to a mistake as
to what the record contains. The case was
dismissed as to this plaintiff in the district court, and he

was discharged and his bond exonerated, and the city of Fort Dodge paid the costs. Again, it is·argued that a voluntary dismissal by the prosecutor is not such a termination of the case as will justify an action of malicious prosecution. This is not the rule of this court. See *White v. International Text Book Co.*, 156 Iowa 210, and cases cited.

It is strenuously argued that there was

9. ARREST: mode of making: nonnecessity for force or physical restraint.

no evidence of any arrest save the one after the information was filed, and that this was made under a proper warrant, and by the chief of police. An arrest is defined by our Code as:

"An arrest is made by an actual restraint of the person to be arrested, or by his submission to the custody of the person making the arrest. No unnecessary force or violence shall be used in making the same, and the person arrested shall not be subjected to any greater restraint than is necessary for his detention." Code Section 5194.

There need not be an application of actual force, or such physical restraint as is visible to the naked eye. *McAleer v. Good,* (Pa.) 10 L. R. A. (N. S.) 303.

Under the testimony adduced by plaintiff, there was an arrest either upon the depot platform or in the depot before any information was filed, and what was done by the chief of police was in virtue of the information filed by defendant's agent, Bull.

VIII. It is said that the dismissal of the action in the district court is not evidence of want of probable cause. This, of course, is true; but the trial court did not instruct to the contrary. Indeed, it placed the burden upon plaintiff of showing want of probable cause and malice, and made no reference in this connection to the dismissal of the suit.

IX. The rightfulness of plaintiff's ejectment from the train, and defendant's responsibility therefor, were not involved in the case, save in the most incidental way, and our

attention has not been called to any error of the court below with reference to this matter.

X.   Complaint is made of the submission of the special interrogatories to the jury, on the ground that there was no charge of any arrest disconnected with the one made by the chief of police after the information was filed; but the record does not support the claim.   Indeed, the contrary is shown.

XI.   Misconduct of plaintiff's counsel in argument is relied upon.   The trial court thought counsel did not overstep the bounds of legitimate argument, and we see no reason for interfering with its conclusion.   We need not set out the arguments complained of: most of the statements were confined to the testimony adduced; and if there was any departure, it had reference to the conduct of defendants' counsel.   This may not have been justifiable, and it is not good taste or good practice for counsel to personally criticise each other for methods adopted by them; but we see no reason for disturbing the finding of the jury, because counsel did not follow the highest ethical notions of the profession.

XII.   The court limited the testimony as to arrest to what occurred after plaintiff left the car and went upon the depot platform.   As no arrest was claimed prior to that time, there was no error here.

XIII.   Defendant asked 24 instructions, and it is said in argument that the trial court was in error in refusing each and all of them.   None are singled out and argument made in support thereof.   We are asked, however, to consider each and every one, and to say that, for some reason not given by counsel, there was error in not giving them.   This, of course, we cannot be expected to do.

10. APPEAL AND ERROR: assignment of error: errors en masse.

XIV.  Much is said in argument about
the question as to whether or not plaintiff
was a passenger upon defendant's train or
a trespasser, and regarding his conduct
before the conductor appeared.  The bearing of this upon the case is not perceived.  The trial court instructed the jury as follows regarding this matter:

11. Evidence: relevancy, competency, and materiality: non-issuable matters.

"You are told that you. may not and must not allow any question or thought of whether or not a reasonably sufficient accommodation was furnished the plaintiff and his companions in connection with the freight train on which cattle were being shipped to Chicago, and on which the undisputed testimony shows they started on their journey, and are further told that you may not and must not allow the question of whether or not anyone was physically injured, or whether or not the plaintiff or his companions were or were not illegally put off from the passenger train or wrongfully injured, to be considered by you.  These questions are not for your consideration or determination in this case, and evidence in regard to such matters was only received in evidence to determine whether or not plaintiff was guilty of such disorderly conduct as in fact would warrant or furnish cause for his arrest."

This instruction was given at defendants' request, and of course no complaint is made of it.

XV.  Complaint is made because the court did not instruct that the conviction of the plaintiff, although set aside upon appeal, was prima-facie · proof of probable cause.  It asked an instruction in this language:

12. Appeal and error: parties entitled to allege error: invited error.

"It is asserted in the petition of the plaintiff that he, with others, were found guilty of disorderly conduct before the police judge of the city of Fort Dodge, Iowa.  Such admission and such facts would be affirmative evidence of

there being probable cause for the arrest and prosecution of the plaintiff, unless you further find that such judgment was legally appealed, such findings of the lower court was set aside, and the plaintiff adjudged not guilty."

Manifestly, it is not now in position to claim error. See also *Olson v. Neal,* 63 Iowa 214, 216; *Flackler v. Novak,* 94 Iowa 634; *Miller v. Runkle,* 137 Iowa 155; *Barber v. Scott,* 92 Iowa 52.

XVI. It is also said that the court was in error in placing the burden upon defendants of showing that the first arrest of plaintiff, if made as charged, was justifiable. There was no error here. *Stewart v. Feeley,* 118 Iowa 524; *Jackson v. Knowlton,* (Mass.) 53 N. E. 134.

13. MALICIOUS PROSECUTION: actions: arrest without warrant: justification: burden of proof.

This case has been ably presented by counsel, and was very carefully tried by the court below. We have considered every proposition which seems to merit attention, and find no error which would justify a reversal. The judgment must, therefore, be, and it is,—*Affirmed.*

GAYNOR, C. J., LADD, WEAVER, EVANS, PRESTON, and STEVENS, JJ., concur.

SALINGER, J. (dissenting).—I. The count for malicious prosecution should, in my opinion, not have been allowed to go to the jury, because there is no evidence that the information was filed by one who had authority to bind defendant by filing same. Is there enough evidence to take to the jury whether one Bull, who swore to the information, had authority to bind defendant by that act? The majority holds that the act of Bull, in filing this information, was the act of the defendant, because: (1) Bull was the "special agent" of the defendant; (2) because he had the duty of investigating "offenses perpetrated against the company;" and (3) because policemen employed by the company, and who made the false arrest, were under the direction and control

of Bull. While these facts may establish that a false arrest sanctioned by Bull, or made by those under his control, may be treated as the act of the defendant, that is true as to false arrest only, and is no warrant for holding that a malicious prosecution, instituted by the filing of information on the part of Bull, is also the act of the defendant. In my judgment, neither the duty to investigate "offenses perpetrated against the company," nor the power to supervise or control depot policemen, gave authority to institute the prosecution at bar. Proof that Bull was "an agent" of the defendant's would fall short of proving that he had authority to bind it by filing informations complaining of disturbances of the peace upon the depot grounds of defendant. Being a "special agent" implies even less authority than being "an agent." The term "special" of itself negatives anything but specifically delegated authority, and proving that one is the "special agent" of a railroad corporation is, therefore, no evidence of authority to bind it by filing informations on its behalf. The testimony additional to this is, first, what Bull told witnesses his powers were. It should not be considered, because agency may not be established by the declarations of the alleged agent. Second, Mr. Bull testified:

"The general character of my work rendered the company includes the investigation of offenses perpetrated against the company * * * I had no special direction in connection with the filing of that information or arresting these men except the exercise of my own best judgment at the time. * * * I received my instructions from Tim T. Kelliher, of Chicago, and from the superintendent of the division."

It appears the policemen who made the arrest were paid by the plaintiff, but appointed by the city of Fort Dodge. They made the arrest on the claim that plaintiff and others were fighting and otherwise disturbing the peace

while upon the depot grounds of the defendant, and it appears that these policemen were under the supervision and control of Bull. It is upon these premises the majority declares:

"There can be no doubt that he had authority from the company to arrest the plaintiff if he thought there was any ground therefor, and that he also had implied authority to direct Core and Gressley to make the arrest. Having this authority, it follows, as a necessary incident thereto, that he had implied authority to file or to direct the filing of an information against the party or parties thus arrested."

In effect, if one have the power; say, to employ, discharge, or direct policemen, and without direction the policemen make an arrest, the first is, without more, authorized to file a sworn information against the persons arrested.

The opinion seems to rely on *Stewart v. Feeley*, 118 Iowa 524. I am constrained to say that there is absolutely nothing in the case that justifies its being cited at all in the case. It decides that, where an arrest is made without a warrant, it is the duty of the officer to take defendant before a magistrate and make complaint. The sections of the statute to which the case refers define, among other things, when a private person may make an arrest without a warrant. As no felony is charged in the information complained of, all that is relevant in this definition is that a private person may make such an arrest for a public offense committed or attempted in his presence. Bull was not a peace officer. Consequently, he could make an arrest only where such offense as he charged was committed or attempted in his presence, and there is no claim that this is true in this case. Assume for the *Stewart* case that it is the duty of an officer who makes an arrest without a warrant to take defendant before a magistrate and make com-

plaint, and the avoidance is that Bull was not an officer, did not make the arrest at all, and that, had he been an officer and made the arrest and made complaint, his authority to do so would come from the law, and not from his employer.   An information is a statement under oath, setting forth the acts of the defendant upon which the complaint is based.   Of necessity, such sworn statement is to be made by one who has knowledge of the facts set forth, or at least has reason to believe that those facts exist.   There is no evidence that Bull knew these facts, or believed that they existed.   All that appears on the subject is the testimony of Bull himself, that he recalls "the month of December, 1911, when some of these men from Cherokee County were arrested," and that he signed the information upon which they were tried.   If one concede that Bull had the right to sign an information at all, that fact makes no one other than himself responsible for the consequences.   In the last analysis, the position of the majority is that, if one is employed to supervise policemen in the service of his employer, such employment makes it his duty to do whatever oath-making may become necessary to initiate punitive proceedings against anyone who commits a public offense which affects the employer specially.   I am loath to hold that there is any such principle in the law of agency.   In my opinion, it would not matter if the defendant had told Bull to swear to all informations charging a disturbance on its depot grounds though he neither knew nor had reason to believe that what he swore to was true.   Such an arrangement would, no doubt, make the parties to it punishable, but, for reasons sounding in public policy, would create no agency to make affidavits.

I would reverse the judgment on the count for malicious prosecution.